# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

KEVIN FRIEDMAN, VIJAY PATEL,
JONATHAN SCHOEFF, MICHAEL SCHOEFF,
and GEORGE SKAFF,

       Plaintiffs,

v.                                     Case No.: 0:19-cv-62481-PCH

DAVID HAMMER; MITCHELL HAMMER;
GHEN SUGIMOTO; DIANE SUGIMOTO;
TRC FUNDING GROUP NO. 1, LLC; and
SMART LEGAL SOLUTIONS, LLC

       Defendants.

_____/

### FIRST AMENDED COMPLAINT

      Plaintiffs, Kevin Friedman, Vijay Patel, Jonathan Schoeff, Michael Schoeff, and George

Skaff (collectively "Plaintiffs"), bring this action against Defendants, Mitchell A. Hammer,

David E. Hammer, Diane Sugimoto, Ghen Sugimoto, TRC Funding Group No. 1, LLC, and

Smart Legal Solutions, LLC (collectively "Defendants") and allege:

### Parties and Jurisdiction

      1.      This is an action for damages against Defendants for violation of Section 10(b) of

the Securities and Exchange Act of 1934, 15 U.S.C. § 77 and Rule 10b-5 promulgated by the

United States Securities and Exchange Commission, codified at 17 C.F.R. section 240.10b-5,

violation of the Florida Securities and Investor Protection Act, Fla. Stat. § 517.301, Fraudulent

Inducement, and Negligent Misrepresentation.

      2.      Plaintiff Kevin Friedman is a citizen of Georgia.

      3.      Plaintiff Vijay Patel is a citizen of Florida.

      4.      Plaintiff Jonathan Schoeff is a citizen of Colorado.

5.      Plaintiff Michael Schoeff is a citizen of Ohio.

6.      Plaintiff George Skaff is a citizen of Ohio.

7.      Defendant Mitchell A. Hammer is a citizen of Florida.

8.      Defendant David E. Hammer is a citizen of Florida.

9.      Defendant Diane Sugimoto is a citizen of Florida.

10.     Defendant Ghen Sugimoto is a citizen of Florida.

11.     Defendant TRC Funding Group No. 1, LLC ("TRC Funding") is a limited liability company formed under the laws of Florida.  Upon information and belief, the members of TRC Funding are Hammer Capital Group, LLC and Taisho Investments, LLC, which are both limited liability companies formed under the laws of Florida.  Upon information and belief, the member of Hammer Capital Group, LLC is Defendant David Hammer.  Upon information and belief, the member of Taisho Investments, LLC is Defendant Ghen Sugimoto.  Therefore, Defendant TRC Funding is a citizen of Florida.  Defendant TRC Funding's principal address is 1000 Corporate Drive, Suite 610, Ft. Lauderdale, Florida 33334.  It may be served at its registered agent for service of process, Mitchell Hammer, at 1000 Corporate Drive, Suite 610, Ft. Lauderdale, Florida 33334.

12.     Defendant Smart Legal Solutions, LLC ("Smart Legal") is a limited liability company formed under the laws of Florida.  Upon information and belief, the members of Smart Legal are Defendants David Hammer and Ghen Sugimoto.  Therefore, Defendant Smart Legal is a citizen of Florida. Defendant Smart Legal's principal address is 1000 Corporate Drive, Suite 610, Ft. Lauderdale, Florida 33334.  It may be served at its registered agent for service of process, Mitchell Hammer, at 1000 Corporate Drive, Suite 610, Ft. Lauderdale, Florida 33334.

13.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, based upon Plaintiffs' claims under the Securities and Exchange Act of 1934, 15 U.S.C. § 78, Rule 10b-5, 17 C.F.R. § 240.10b-5. Federal courts have exclusive jurisdiction over violations of the Securities and Exchange Act of 1934. 15 U.S.C. § 78aa.

14.     This Court has pendant jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     Personal jurisdiction is proper over the Defendants because they reside in the State of Florida and a substantial part of the events giving rise to this controversy occurred in Florida.

16.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because the acts and omissions giving rise to the claims alleged herein occurred in this judicial district.

17.     In connection with the acts alleged in this Complaint, Defendants used or caused to be used the means and instrumentalities of interstate commerce, including but not limited to email, mail and interstate telephone communications.

**Allegations Applicable to All Counts**

18.     Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly engaged in acts, transactions and business practices which operated to defraud and deceive Plaintiffs. As set forth herein, Defendants made various untrue statements of material facts and omitted to state other material facts which, had those facts been disclosed, would have revealed the fraud being committed by Defendants.

19.     In or about January, 2017, Defendant Ghen Sugimoto approached Plaintiff Kevin Friedman with an "investment opportunity" which he claimed was "guaranteed." A few days

later, Plaintiff Kevin Friedman spoke with Defendant Diane Sugimoto about the "opportunity," who reiterated the statements made by Ghen Sugimoto. These two Defendants, along with Mitchell Hammer, on numerous occasions represented that the investment had "zero risk," and Plaintiff Kevin Friedman relied upon said representations.  Defendant Ghen Sugimoto was Plaintiff Kevin Friedman's childhood friend, and Defendant Diane Sugimoto is Ghen Sugimoto's mother.  Plaintiff Kevin Friedman had known Defendants Ghen Sugimoto and Diane Sugimoto almost his entire life, and had the utmost trust in their representations that the investment was "zero risk"  Plaintiff Kevin Friedman considered Defendant Ghen Sugimoto one of his best friends.   In reasonable reliance on Defendants' representations, Plaintiff Kevin Friedman informed the other plaintiffs of the investment opportunity. Ghen and Diane represented they had multiple millions of dollars of their own funds invested in the existing cases.  Further, they stated they had sold a previous group of cases to the Akin Mears law firm for $40 million and these new cases were worth tens of millions of dollars.   Further, they stated there was *no chance* that they would not be able to meet their commitment to payback the investors' capitol as promised at the year mark from investing with absolute certainty.

20.    Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto represented to Plaintiffs that their investment would fund litigation of products liability cases for clients of attorney Lonny Bramzon ("Bramzon") and his law firm, Bramzon & Associates Specialty Litigation, LLC ("BASL"). Plaintiff Kevin Friedman has also known Bramzon since childhood and was a close friend with Bramzon.  Bramzon told Plaintiff Kevin Friedman that he strongly believed in this business model and that Bramzon's brother, also an attorney, had reviewed and vouched for the legality of the business model.   Additionally,

Bramzon and Defendant Diane Sugimoto assured Plaintiff Kevin Friedman that the Plaintiffs had hired outside attorneys to review the business model, and that they approved of the model.

21.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto represented to Plaintiffs that BASL had a docket of approximately 12,500 transvaginal mesh cases and 2,500 other cases, including but not limited to Xarelto, Pradaxa, Risperdal, IVC blood clot filter, Talc Powder, Invokana, and Benicar, thousands of which were in various stages of the settlement process for its clients.

22.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto, and Ghen Sugimoto further represented to Plaintiffs that tens of millions of dollars in settlement proceeds from these thousands of products liability cases would be available and would be utilized to pay back Plaintiffs' initial investment in a year, which would more than double their investments within 2 to 3 years. Defendants repeatedly informed Plaintiffs that this was a "zero risk" investment.

23.     Defendants' representations were false.  Defendants intentionally failed to disclose the true nature and character of the investment, including but not limited to inflating the number of viable cases from which the settlement proceeds would be paid, and the speed with which the cases would resolve.

24.     In or about September 2016, just months before Plaintiffs were defrauded into investing several million dollars, unbeknownst to Plaintiffs, Defendant Mitchell Hammer recognized that their "operation" of obtaining settlement proceeds was not stable, that they were in significant debt and that they needed "capital" to continue the "operation."

25.     To facilitate Defendants' fraudulent investment scheme, on or about January 1, 2017, Defendants David Hammer and Ghen Sugimoto formed Defendants Smart Legal, and TRC

Funding, both of which are Florida limited liability companies. Defendants David Hammer and Ghen Sugimoto are the managers of Smart Legal and TRC Funding.

26.     Due to the instability of the operation and their need of capital, Defendants induced Plaintiffs, through their misrepresentations of the true nature and character of the investments, to invest in TRC Funding.

27.     Defendant Smart Legal prepared a private placement memorandum, attached as **Exhibit 1**, which offered preferred units of membership in Defendant TRC Funding in exchange for cash investment.  Indeed, it appears as though Defendants prepared multiple version of the Private Placement Memorandum for different Plaintiffs and others.  All versions of the Private Placement Memorandum stated, in part, that TRC Funding was "offering investors an opportunity to purchase up to three hundred (300) Preferred Units for three million U.S. dollars (US $3,000,000) in the aggregate which they will purchase for ten thousand U.S. dollars (US $10,000) per Preferred Unit."

28.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, represented to Plaintiffs that settlement proceeds from the thousands of products liability cases would be available to redeem the preferred units of membership in TRC Funding (and thereby provide Plaintiffs with a return on their investment), according to schedules set forth in the private placement memorandum.  The first group of Units was to be redeemed by TRC Funding "no later than twelve (12) months and one (1) day from the date the investor's subscription is accepted by the Company."

29.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC

Funding, represented to Plaintiffs that their investment would go toward processing and funding the products liability cases to obtain settlement proceeds, and that TRC Funding was part of a group of several affiliate companies (the "Group"), many of which were Smart Legal's subsidiaries, that had combined their efforts and resources to become one of the largest providers of legal case processing and plaintiff support services.

30.     The private placement memorandum specifically represented that the "net proceeds realized from this Offering will be used by the Company for working capital and to finance the administrative and case management costs of plaintiffs' mass tort cases."  This was false.

31.     Despite their awareness that the "operation" was not stable, Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, falsely represented to Plaintiffs that investment in TRC Funding would generate substantial returns based on the Group's detailed plans for using the capital to develop and prove thousands of products liability cases using, among other things, the Group's marketing strategies, technology platforms, vendor relationships, processes for case management, and fee agreements with BASL and its co-counsel for the cases.

32.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, falsely represented to Plaintiffs that the Group had developed a system for vetting products liability cases and generating an internal rate of return of more than 240% within 12 months.

33.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, represented to Plaintiffs that Defendant David Hammer earned a Juris Doctorate and Master of Laws in Taxation from University of Florida and that his four years of law practice led him to a career in business. Defendants failed to disclose that in Defendant David Hammer's four years of law practice he was once reprimanded, twice suspended, and ultimately disbarred by the Florida Bar.

34.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, failed to disclose to Plaintiffs at the time of their investments that Defendant David Hammer's father, Defendant Mitch Hammer, had been criminally convicted of violating securities laws and would be involved in the management of TRC Funding.

35.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, falsely represented to Plaintiffs that TRC had no private or institutionalized debts, and failed to disclose to Plaintiffs that TRC Funding's assets were encumbered by more than $8 million of indebtedness. As a result of this indebtedness, Defendants were forced to sell the proceeds of over 4000 cases (which defendants represented would be used to redeem Plaintiffs' investment) to pay down the debt.

36.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, failed to disclose to Plaintiffs that a former vendor's claims against TRC Funding would affect TRC Funding's ability to perform its financial obligations and make the payments

required to redeem the preferred units of membership in TRC Funding according to the schedules set forth in the private placement memorandum.

37.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, participated in numerous telephone conferences with one or more of the Plaintiffs to promote their investment in TRC Funding.  However, Defendants repeatedly assured Plaintiffs that the investments were "zero risk."

38.     During these telephone conferences, Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, made misrepresentations and omissions, and concealed material information about the nature of the investment, including the number of viable cases that would generate settlement funds, the amounts of settlement funds available.

39.     Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, further made misrepresentations regarding and TRC Funding and the circumstances relating to TRC Funding's ability to perform its financial obligations and make the payments required to redeem the preferred units of membership in TRC Funding.

40.     Defendants knew or should have known that all of the foregoing representations were false and that all of the foregoing omissions were material to Plaintiffs' decision to purchase preferred units of membership in TRC Funding.

41.     The private placement memorandum, on page fifteen (15) purports to outline certain "risk factors" associated with the investment.  While the language in the private placement memorandum may have suggested that the investment carried some risk, it did not

warn or inform the Plaintiffs that the entire scheme was fraudulent.  As part of their fraudulent scheme, Defendants repeatedly represented to Plaintiffs that there was "zero" risk associated with the investment.

42.     Defendants intended for Plaintiffs to rely, and knew that Plaintiffs would rely, on the representations and omissions made by Defendants. Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, made such misrepresentations with the intention to induce Plaintiffs into purchasing millions of dollars of preferred units in TRC Funding, which they had formed to facilitate the scheme.

43.     Plaintiffs relied on the foregoing representations, and were not aware of the foregoing omissions, when Plaintiffs accepted the offering in the private placement memorandum and purchased preferred units of membership in TRC Funding in 2017, as follows:

a.   Plaintiff Kevin Friedman: $875,000.00 ($250,000.00 in February 2017; $600,000.00 in April 2017; and $25,000.00 in August 2017);

b.   Plaintiff Vijay Patel: $1,000,000.00 ($500,000.00 in September 2017 and $500,000.00 in January 2018);

c.   Plaintiff George Skaff: $100,000.00 (in September 2017);

d.   Plaintiff Michael Schoeff: $750,000.00 ($500,000.00 in February 2017 and $250,000.00 in August 2017)

e.   Plaintiff Jonathan Schoeff: $400,000.00 ($250,000.00 in January 2017 and $150,000.00 in August 2017)

44.     During or about the time of their initial investments, in reliance on the misrepresentations of the Defendants, Plaintiffs entered into Subscription Agreements to

purchase the units of TRC Funding.  The Subscription Agreements were signed on behalf of TRC Funding by Defendant Ghen Sugimoto and David Hammer, as managers of the company.

45.     During or about February of 2017, Bramzon, acting as the sole manager and stakeholder of BASL, entered into a Guaranty in which BASL agreed to perform all of TRC Funding's financial obligations to each Plaintiff to the same extent and with the same force and effect as if BASL was the issuer of the private placement memorandum for TRC Funding.  Mr. Bramzon entered into a second Guaranty on or about April 2017.  True and correct copies of these Guarantees are attached hereto as **Exhibit 2.**

46.     During or around April, 2017, Defendant Mitchell Hammer, individually, entered into a Guaranty in which Mitchell Hammer agreed to perform all of TRC Funding's financial obligations to Plaintiff Kevin Friedman to the same extent and with the same force and effect as if Mitchell Hammer was the issuer of the private placement memorandum for TRC Funding. Such was done by defendant Mitchell Hammer to induce a subsequent investment from Plaintiff Kevin Friedman, said total investment of Plaintiff Kevin Friedman being $875,000.  A true and correct copy of the Guaranty is attached hereto as **Exhibit 3.**

47.     During or around August 2017, defendants Ghen Sugimoto, Mitchell Hammer and David Hammer, joint and severally, entered into a Guaranty in which they assumed full responsibility for financial performance by TRC Funding under the Private Placement Memorandum and Michael Schoeff's Subscription Agreement, to redeem the Units purchased by Michael Schoeff for four hundred thousand dollars ($400,000.00).  A true and correct copy of the Guaranty is attached hereto as **Exhibit 4.**  This Guaranty was expressly given "in order to induce Michael Schoeff . . . to enter into that certain Private Placement Memorandum dated January 31, 2017 with TRC Funding Group No. 1. LLC. . ."

48.     During or around August 2017, defendants Ghen Sugimoto, Mitchell Hammer and David Hammer, joint and severally, entered into a Guaranty in which they assumed full responsibility for financial performance by TRC Funding under the Private Placement Memorandum and George Skaff's Subscription Agreement, to redeem the Units purchased by George Skaff for one hundred thousand dollars ($100,000.00).  A true and correct copy of the Guaranty is attached hereto as **Exhibit 5.**  This Guaranty was expressly given "in order to induce George Skaff . . . to enter into that certain Private Placement Memorandum dated January 31, 2017 with TRC Funding Group No. 1. LLC. . ."

49.     Under the Guarantees, Ghen Sugimoto, Mitchell Hammer and David Hammer expressly agreed to pay Michael Schoeff and George Skaff "all expenses" arising out of any action, litigation or proceeding to enforce the terms of the Guaranty, including but not limited to court costs and all attorneys' fees incurred by Michael Schoeff or George Skaff. Under the Guarantees, Ghen Sugimoto, Mitchell Hammer and David Hammer were required to notify Michael Schoeff and George Skaff within thirty (30) business days if TRC Funding raised additional capital, if repayment of the subsequently raised capital would have a payment preference or priority of any kind. . ."

50.     Bramzon and BASL, and Ghen Sugimoto, Mitchell Hammer and David Hammer provided Plaintiffs with the Guarantees and private placement memorandum to induce Plaintiffs' investment and obtain funding for litigation of products liability cases for clients of Bramzon and BASL.  Defendants both intended for Plaintiffs to rely, and knew that Plaintiffs would rely, on the false representations made therein. The Guarantees were to further falsely reassure Plaintiffs that the investment was "zero risk."

51.     Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer, along with BASL, never intended to abide by their Guarantees.  Indeed, Defendant Mitchell Hammer knew that he was "over-extended" on guarantees, and that investors would have to get in line to collect based on the Guaranty.

52.     TRC Funding has failed and refused to perform its financial obligations to Plaintiffs and has not made any of the payments required to redeem the preferred units of membership in TRC Funding according to the schedules set forth in the private placement memorandum.

53.     BASL and Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer have failed to perform all of their financial obligations to Plaintiffs and have not made any of the payments required to redeem the preferred units of membership in TRC Funding according to schedules set forth in the private placement memorandum.

54.     During or around the spring of 2017, after investing in TRC Funding, Plaintiff Kevin Friedman learned that Defendant David Hammer had been disbarred after only four years of practicing law, and that Defendant Mitchell Hammer had been convicted of violating securities laws.  Plaintiff Kevin Friedman confronted Defendants Diane Sugimoto and Ghen Sugimoto, along with Bramzon, who repeatedly assured him that Defendants David and Mitchell Hammer were "great people" who had made mistakes in the past, and that their pasts did not impact the investment.  Plaintiff Kevin Friedman thereafter had a phone call with Defendant Mitchell Hammer, who once again reassured Plaintiff Kevin Friedman that his past would not impact the investment.  Plaintiff Kevin Friedman was assured by the individual defendants that he could expect trust and confidence in the integrity of Defendants David Hammer and Mitchell

Hammer. Plaintiffs Michael Schoeff, Jonathan Schoeff, George Skaff, and Vijay Patel were not aware of these conversations Plaintiff Kevin Friedman had with the individual defendants.

55.     The criminal and unethical backgrounds of Defendants David Hammer and Mitchell Hammer were material facts that would have substantially impacted Plaintiffs' decision to invest in TRC Funding, especially given that the criminal conduct involved securities fraud.

56.     After their misrepresentations induced Plaintiffs to invest in TRC Funding, Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, continued to misrepresent TRC Funding's ability to redeem the units as set forth in the private placement memorandum. Defendants repeatedly misrepresented the status of the settlements and failed to disclose other debts owed by TRC Funding. Defendants repeatedly and falsely assured Plaintiffs that they would receive a return on their investments as promised and as set forth in the private placement memorandum. Due to the fraudulent concealment of the true nature of the investment in TRC Funding by Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, for their own self-interests and on behalf of Defendants TRC Funding and Smart Legal, Plaintiffs did not know the true facts and had no reason to believe otherwise.

57.     Defendants' representations were false, as they never intended to return any of the Plaintiffs' investments.

58.     Rather, Defendants David Hammer, Mitchell Hammer, Diane Sugimoto and Ghen Sugimoto, in their own self-interests and on behalf of Defendants Smart Legal and TRC Funding, have used the Plaintiffs' investments in TRC Funding to, among other things: (1) fund a number of other companies owned by the Defendants; (2) fund BASL; (3) make deposits into

various members Defendants' personal accounts; and (4) make deposits into various personal and business accounts unrelated and unaffiliated with the Defendants or Bramzon and BASL.

### Count I
### Violation of Section 10(b) of the
### 1934 Securities and Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10B-5)

59.     Plaintiffs reallege paragraphs 1– 58.

60.     This is a claim for damages against Defendants for violation of Section 10(b) of the 1934 Securities and Exchange Act, 15 U.S.C. § 77 and Rule 10b-5, codified at 17 C.F.R. section 240.10b-5.

61.     Defendants employed a fraudulent scheme whereby their misrepresentations and omissions of material facts to Plaintiffs relating to the private placement memorandum, the Guarantees, and TRC Funding induced Plaintiffs to invest more than $3 million in TRC Funding.

62.     As set forth in paragraphs 18-53 above, in relation to the sale of securities, Defendants used means or instrumentalities of interstate commerce, including but not limited to the mails and telephone communications, to engage in acts, practices or courses of business which operated as a fraud and deceit upon Plaintiffs.

63.     Defendants' intentional misrepresentations included, but were not limited to: (1) that BASL had a docket of approximately 15,000 cases; (2) that settlement proceeds from these cases would be available to redeem the preferred units of membership in TRC Funding within one year; (3) that investment in TRC Funding would generate substantial returns on Plaintiffs' investments; (4) that the Group had developed a system to generate a return of more than 240% on Plaintiffs' investments within 12 months;  (5) that Plaintiffs' investments in TRC Funding would be used to fund litigation of products liability cases for clients of Bramzon and BASL; (6) they would guarantee that TRC Funding would redeem the units as set forth in the private

placement memorandum and that the Plaintiffs would otherwise be paid back; and (7) that the cases would generate tens of millions of dollars in the next year, the same to be realized by Plaintiffs

64.     Defendants' intentional material omissions included, but were not limited to: (1) that Defendant David Hammer had been disbarred; (2) that Defendant Mitchell Hammer had been criminally convicted of violating securities laws and would be involved in the management of TRC Funding; (3) that TRC Funding's assets were substantially encumbered; and (4) that a former vendor's claims against TRC Funding would materially affect TRC Funding's ability to perform its financial obligations.

65.     Defendants' material representations to Plaintiffs were untrue, and Defendants' omissions of material facts were necessary so that Defendants' misrepresentations to Plaintiffs appeared to be not misleading.

66.     The Defendants' untrue statements of material facts and omissions alleged herein were made with the intention of inducing, and did thereby induce, Plaintiffs to purchase the units of TRC Funding.

67.     Defendants knew that Plaintiffs relied upon their material misrepresentations and omissions in making the decision to invest millions of dollars in TRC Funding.

68.     In reasonable reliance on Defendants' misrepresentations and omissions, Plaintiffs invested over three million dollars ($3,000,000.00) in units of TRC Funding in 2017 and 2018, as follows:

> a.   Plaintiff Kevin Friedman: $875,000.00
>
> b.   Plaintiff Vijay Patel: $1,000,000.00
>
> c.   Plaintiff George Skaff: $100,000.00

    d.   Plaintiff Michael Schoeff: $750,000.00

    e.   Plaintiff Jonathan Schoeff: $400,000.00

69.    The securities (i.e., the units of TRC Funding) that are the subject of the private offering memorandum and the Subscription Agreements were not registered under the 1933 Federal Securities Act.

70.    Plaintiffs would not have agreed to purchase the securities and invest in TRC Funding but for Defendants' misleading statements and failure to disclose material facts.

71.    Defendants' material misstatements and omissions were committed with scienter, as Defendants knew their scheme was unstable and they needed capital. Defendants repeatedly and intentionally misrepresented the true nature of the investment to Plaintiffs, to induce them to invest so that Defendants could use the investment funds for their own personal uses as alleged above.  Defendants' scienter is further demonstrated by Defendants' concealment of their fraud, and repeated assurances that the investment was "zero risk."

72.    As a direct and proximate result of Defendants' intentional wrongful conduct, Plaintiffs suffered damages in connection with the purchase of preferred membership interests in TRC Funding.

73.    Defendants' conduct was willful, malicious, oppressive, and/or reckless, and was of such nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for damages, including punitive damages, attorneys' fees, costs and any further relief this Court deems proper.

**Count II**
**Violation of Section 20(a) of the**
**1934 Securities and Exchange Act (15 U.S.C. § 78t)**
**(Against David Hammer, Mitchell Hammer, Ghen Sugimoto, and Diane Sugimoto)**

74.     Plaintiffs re-allege paragraphs 1– 58 and Count I as it relates to Defendants TRC Funding Group No. 1, LLC and Smart Legal Solutions, LLC (paragraphs 59 – 73).

75.     This is a claim for damages against the individual Defendants, David Hammer, Mitchell Hammer, Ghen Sugimoto, and Diane Sugimoto, for violation of Section 20(a) of the 1934 Securities and Exchange Act, 15 U.S.C. § 78t.

76.     This claim is brought in the alternative to Count I against the individual Defendants, David Hammer, Mitchell Hammer, Ghen Sugimoto, and Diane Sugimoto, to the extent those individual defendants are not liable under Count I as primary violators of the Exchange Act.

77.     Defendants TRC Funding Group No. 1, LLC and/or Smart Legal Solutions, LLC violated Section 10(b) of the 1934 Securities and Exchange Act of 1934 and Rule 10b-5 as set forth in Count I, which is incorporated herein as to those two corporate defendants.

78.     The individual Defendants, David Hammer, Mitchell Hammer, Ghen Sugimoto, and Diane Sugimoto, had the power to control — and did control — the general business affairs of TRC Funding, Smart Legal Solutions, LLC, and all affiliates and subsidiaries.

79.     The individual Defendants, David Hammer, Mitchell Hammer, Ghen Sugimoto, and Diane Sugimoto, had the requisite power to directly and/or indirectly control or influence all representations, including the false representations identified herein, made to Plaintiffs in order to induce their investments.

80.     As a direct and proximate result of the individual Defendants' intentional wrongful conduct, Plaintiffs suffered damages in connection with the purchase of preferred membership interests in TRC Funding.

81.     Defendants' conduct was willful, malicious, oppressive, and/or reckless, and was of such nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

WHEREFORE, Plaintiffs demand judgment against each of the individual Defendants, including David Hammer, Mitchell Hammer, Ghen Sugimoto, and Diane Sugimoto, jointly and severally, for damages, including punitive damages, attorneys' fees, costs and any further relief this Court deems proper.

**Count III**
**Violation of the Florida Securities Investor Protection Act,**
**Section 517.301, Florida Statutes**

82.     Plaintiffs reallege paragraphs 1-58.

83.     This is a claim for damages against Defendants for violation of Florida's Securities and Investor Protection Act, Section 517.301, Florida Statues.

84.     Defendants employed a fraudulent scheme whereby their misrepresentations and omissions of material facts to Plaintiffs relating to the offer and sale of securities (i.e. the Units of TRC Funding as set forth in the private placement memorandum) induced Plaintiffs to invest more than $3 million in TRC Funding.   Defendants owed Plaintiffs a duty to ensure that full and fair disclosures were made in connection with the securities offered to Plaintiffs in the private placement memorandum.

85.     Defendants' intentional misrepresentations included, but were not limited to: (1) that BASL had a docket of approximately 15,000 cases; (2) that settlement proceeds from these

cases would be available to redeem the preferred units of membership in TRC Funding within one year; (3) that investment in TRC Funding would generate substantial returns on Plaintiffs' investments; (4) that the Group had developed a system to generate a return of more than 240% on Plaintiffs' investments within 12 months;  (5) that Plaintiffs' investments in TRC Funding would be used to fund litigation of products liability cases for clients of Bramzon and BASL; and (6) they would guarantee that TRC Funding would redeem the units as set forth in the private placement memorandum, and that the Plaintiffs would otherwise be paid back; and (7) that the cases would generate tens of millions of dollars in the next year, the same to be realized by Plaintiffs

86.     Defendants' intentional material omissions included, but were not limited to: (1) that Defendant David Hammer had been disbarred; (2) that Defendant Mitch Hammer had been criminally convicted of violating securities laws and would be involved in the management of TRC Funding; (3) that TRC Funding's assets were substantially encumbered; and (4) that a former vendor's claims against TRC Funding would materially affect TRC Funding's ability to perform its financial obligations.

87.     Defendants' material representations to Plaintiffs were untrue, and Defendants' concealment of material facts were necessary so that Defendants' misrepresentations to Plaintiffs appeared to be not misleading.

88.     The Defendants' untrue statements of material facts and omissions alleged herein were made with the intention of inducing, and did thereby induce, Plaintiffs to purchase the units of TRC Funding.

89.     Defendants knew that Plaintiffs relied upon their material misrepresentations and omissions in making the decision to invest millions of dollars in TRC Funding.

90.    In reasonable reliance on Defendants' misrepresentations and concealment, Plaintiffs invested over three million dollars ($3,000,000.00) in units of TRC Funding in 2017 and 2018, as follows:

      a.    Plaintiff Kevin Friedman: $875,000.00

      b.    Plaintiff Vijay Patel: $1,000,000.00

      c.    Plaintiff George Skaff: $100,000.00

      d.    Plaintiff Michael Schoeff: $750,000.00

      e.    Plaintiff Jonathan Schoeff: $400,000.00

91.    Plaintiffs would not have agreed to purchase the securities and invest in TRC Funding but for Defendants' misleading statements and failure to disclose material facts.

92.    Defendants' material misstatements and omissions were committed with scienter, as Defendants knew their scheme was unstable and they needed capital. Defendants repeatedly and intentionally misrepresented the true nature of the investment to Plaintiffs, to induce them to invest so that Defendants could use the investment funds for their own personal uses as alleged above.  Defendants' scienter is further demonstrated by Defendants' concealment of their fraud, and repeated assurances that the investment was "zero risk."

93.    As a direct and proximate result of Defendants' wrongful conduct and violations of section 517.301, Plaintiffs suffered damages in connection with the purchase of preferred membership interests in TRC Funding. As alleged herein, each defendant personally participated in the fraudulent sale of units in TRC Funding to Plaintiffs, and therefore defendants are jointly and severally liable to Plaintiffs pursuant to section 517.211(2).

94.    Plaintiffs are entitled to recover prevailing party attorney fees under section 517.211(6), Florida Statutes.

95.     Defendants' conduct was willful, malicious, oppressive, and/or reckless, and was of such nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for damages, including punitive damages, attorneys' fees, costs and any further relief this Court deems proper.

### Count IV
### Fraud in the Inducement

96.     Plaintiffs reallege paragraphs 1–58.

97.     As set forth above, Defendants employed a fraudulent scheme whereby their misrepresentations and omissions of material facts to Plaintiffs relating to the offer and sale of the Units of TRC Funding as set forth in the private placement memorandum induced Plaintiffs to invest more than $3 million in TRC Funding.   Defendants owed Plaintiffs a duty to ensure that full and fair disclosures were made in connection with the securities offered to Plaintiffs in the private placement memorandum.

98.     Defendants' intentional misrepresentations included, but were not limited to: (1) that BASL had a docket of approximately 15,000 cases; (2) that settlement proceeds from these cases would be available to redeem the preferred units of membership in TRC Funding within one year; (3) that investment in TRC Funding would generate substantial returns on Plaintiffs' investments; (4) that the Group had developed a system to generate a return of more than 240% on Plaintiffs' investments within 12 months;  (5) that Plaintiffs' investments in TRC Funding would be used to fund litigation of products liability cases for clients of Bramzon and BASL; (6) they would guarantee that TRC Funding would redeem the units as set forth in the private placement memorandum, and that the Plaintiffs would otherwise be paid back; and (7) that the

cases would generate tens of millions of dollars in the next year, the same to be realized by Plaintiffs.

99.     Defendants' intentional material omissions included, but were not limited to: (1) that Defendant David Hammer had been disbarred; (2) that Defendant Mitch Hammer had been criminally convicted of violating securities laws and would be involved in the management of TRC Funding; (3) that TRC Funding's assets were substantially encumbered; and (4) that a former vendor's claims against TRC Funding would affect TRC Funding's ability to perform its financial obligations.

100.     Defendants' material representations to Plaintiffs were untrue, and Defendants' omissions of material facts were necessary so that Defendants' misrepresentations to Plaintiffs appeared to be not misleading.

101.     The Defendants' untrue statements of material facts and omissions/concealment alleged herein regarding the true nature of the investment were made with the intention of inducing, and did thereby induce, Plaintiffs to purchase the units of TRC Funding. Defendants then used use the investment funds for their own personal uses as alleged above.

102.     Defendants knew that Plaintiffs relied upon their material misrepresentations and omissions in making the decision to invest millions of dollars in TRC Funding.

103.     In reasonable reliance on Defendants' misrepresentations and concealment, Plaintiffs invested over three million dollars ($3,000,000.00) in units of TRC Funding in 2017 and 2018, as follows:

> a.   Plaintiff Kevin Friedman: $875,000.00
>
> b.   Plaintiff Vijay Patel: $1,000,000.00
>
> c.   Plaintiff George Skaff: $100,000.00

      d.   Plaintiff Michael Schoeff: $750,000.00

      e.   Plaintiff Jonathan Schoeff: $400,000.00

104.    Plaintiffs would not have agreed to purchase the securities and invest in TRC Funding if Plaintiffs had been aware of the lack of truthfulness in Defendants' misleading statements and failure to disclose material facts.

105.    Due to Plaintiffs' reliance on Defendants' representations and omissions, Plaintiffs have suffered damages.

106.    Defendants' conduct was willful, malicious, oppressive, and/or reckless, and was of such nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for damages, including punitive damages, attorneys' fees, costs and any further relief this Court deems proper.

## Count V
## Negligent Misrepresentation

107.    Plaintiffs reallege paragraphs 1-58.

108.    As set forth above, Defendants employed a fraudulent scheme whereby their misrepresentations and omissions of material facts to Plaintiffs relating to the offer and sale of the Units of TRC Funding as set forth in the private placement memorandum induced Plaintiffs to invest more than $3 million in TRC Funding.   Defendants owed Plaintiffs a duty to ensure that full and fair disclosures were made in connection with the securities offered to Plaintiffs in the private placement memorandum.

109.    Defendants' intentional and/or negligent misrepresentations included, but were not limited to: (1) that BASL had a docket of approximately 15,000 cases; (2) that settlement

proceeds from these cases would be available to redeem the preferred units of membership in TRC Funding within one year; (3) that investment in TRC Funding would generate substantial returns on Plaintiffs' investments; (4) that the Group had developed a system to generate a return of more than 240% on Plaintiffs' investments within 12 months;  (5) that Plaintiffs' investments in TRC Funding would be used to fund litigation of products liability cases for clients of Bramzon and BASL; (6) they would guarantee that TRC Funding would redeem the units as set forth in the private placement memorandum, and that the Plaintiffs would otherwise be paid back; and (7) that the cases would generate tens of millions of dollars in the next year, the same to be realized by Plaintiffs.

110.    Defendants' intentional and/or negligent material omissions included, but were not limited to: (1) that Defendant David Hammer had been disbarred; (2) that Defendant Mitch Hammer had been criminally convicted of violating securities laws and would be involved in the management of TRC Funding; (3) that TRC Funding's assets were substantially encumbered; and (4) that a former vendor's claims against TRC Funding would affect TRC Funding's ability to perform its financial obligations.

111.    Defendants knew or should have known that their material representations to Plaintiffs were untrue, and Defendants' omissions of material facts were necessary so that Defendants' misrepresentations to Plaintiffs appeared not to be misleading.

112.    The Defendants' untrue statements of material facts and concealment alleged herein regarding the true nature of the investment were made with Defendants' knowledge of their falsity, or under circumstances in which Defendants ought to have known of their falsity. Defendants intended to induce, and did thereby induce, Plaintiffs to purchase the units of TRC

Funding. Defendants then used use the investment funds for their own personal uses as alleged above.

113.    Defendants knew that Plaintiffs relied upon their material misrepresentations and omissions in making the decision to invest millions of dollars in TRC Funding.

114.    In reliance on Defendants' misrepresentations and concealment, Plaintiffs invested over three million dollars ($3,000,000.00) in units of TRC Funding in 2017 and 2018, as follows:

      a.  Plaintiff Kevin Friedman: $875,000.00

      b.  Plaintiff Vijay Patel: $1,000,000.00

      c.  Plaintiff George Skaff: $100,000.00

      d.  Plaintiff Michael Schoeff: $750,000.00

      e.  Plaintiff Jonathan Schoeff: $400,000.00

115.    Plaintiffs would not have agreed to purchase the securities and invest in TRC Funding if Plaintiffs had been aware of the lack of truthfulness in Defendants' misleading statements and failure to disclose material facts.

116.    Due to Plaintiffs' reliance on Defendants' negligent representations and omissions, Plaintiffs have suffered damages.

117.    Defendants' conduct was willful, malicious, oppressive, and/or reckless, and was of such nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for damages, including punitive damages, attorneys' fees, costs and any further relief this Court deems proper.

## Count VI
### Breach of Guaranty (on behalf of Plaintiff Kevin Friedman against Defendant Mitchell Hammer)

118.    Plaintiffs reallege paragraphs 1-58.

119.    In consideration for Kevin Friedman's investment in TRC Funding, Defendant Mitchell Hammer personally guaranteed TRC Funding's performance to Kevin Friedman under the private placement memorandum.

120.    Defendant Mitchell Hammer breached the Guaranty by failing to guarantee TRC Funding's performance.

121.    As a result of Defendant Mitchell Hammer's breach of the Guaranty, Plaintiff Kevin Friedman has suffered damages.

WHEREFORE, Plaintiff Kevin Friedman demands judgment against Defendant Mitchell Hammer for damages, interest, costs, attorney fees, and any further relief this Court deems proper.

## Count VII
### Breach of Guaranty (on behalf of Plaintiff Michael Schoeff against Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer)

122.    Plaintiffs reallege paragraphs 1-58.

123.    In consideration for Michael Schoeff's investment in TRC Funding, Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer personally guaranteed and assumed full responsibility for TRC Funding's performance to Michael Schoeff under the private placement memorandum under the terms set forth in the Guaranty.

124.    Under the Guaranty, Ghen Sugimoto, Mitchell Hammer and David Hammer further agreed to pay all expenses, including attorneys' fees and court costs, arising out of any action, litigation or proceeding instituted to enforce the terms and conditions of the Guaranty.

125.    Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer breached the Guaranty by failing to notify Michael Schoeff of additional debt incurred by TRC Funding, and by failing to guarantee TRC Funding's performance.

126.    As a result of Defendants' breach of the Guaranty, Plaintiff Michael Schoeff has suffered damages.

127.    Under the Guaranty, Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer agreed to pay Michael Schoeff "all expenses" arising out of any action, litigation or proceeding to enforce the terms of the Guaranty, including but not limited to court costs and all attorneys' fees incurred by Michael Schoeff.

WHEREFORE, Plaintiff Michael Schoeff demands judgment against Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer for damages, interest, costs, attorney fees, and any further relief this Court deems proper.

### Count VIII
### Breach of Guaranty (on behalf of Plaintiff George Skaff against Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer)

128.    Plaintiffs reallege paragraphs 1-58.

129.    In consideration for George Skafff's investment in TRC Funding, Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer personally guaranteed and assumed full responsibility for TRC Funding's performance to George Skaff under the private placement memorandum under the terms set forth in the Guaranty.

130.    Under the Guaranty, Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer further agreed to pay all expenses, including attorneys' fees and court costs, arising out of any action, litigation or proceeding instituted to enforce the terms and conditions of the Guaranty.

131.    Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer breached the Guaranty by failing to notify George Skaff of additional debt incurred by TRC Funding, and by failing to guarantee TRC Funding's performance.

132.    As a result of Defendants' breach of the Guaranty, Plaintiff George Skaff has suffered damages.

133.    Under the Guaranty, Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer agreed to pay George Skaff "all expenses" arising out of any action, litigation or proceeding to enforce the terms of the Guaranty, including but not limited to court costs and all attorneys' fees incurred by George Skaff.

WHEREFORE, Plaintiff George Skaff demands judgment against Defendants Ghen Sugimoto, Mitchell Hammer and David Hammer for damages, interest, costs, attorney fees, and any further relief this Court deems proper.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages, attorney's fees, costs and any further relief this Court deems proper.

### Count IX
### Accounting

134.    Plaintiffs reallege paragraphs 1–58.

135.    As set forth above, the transactions between Plaintiffs and Defendants in the offer and sale of Units in TRC Funding are complex because they involve numerous individuals, entities and accounts, and involve the diversion of Plaintiffs' investment funds.  As further alleged above, Defendants have not used Plaintiffs' investment to fund product liability litigation as represented, but have diverted the funds to various accounts and entities, to pay other debts or for their personal use.

136.    Plaintiffs are not aware of and have no way of verifying where their investment funds were diverted. Plaintiffs are without an adequate remedy at law and require an equitable accounting from Defendants as payments, disbursements and/or distributions of their invested funds.  Plaintiffs are further entitled to an accounting as to Defendants' possession, use, and conversion of all monies invested in TRC Funding by Plaintiffs, and to determine where their investment funds were diverted.

WHEREFORE, Plaintiffs respectfully request an Order of this Court requiring a full equitable accounting as to their investment funds, and other such relief as the Court deems just and necessary.

## **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enter Judgment for Plaintiffs and against Defendants as to each Count of this Amended Complaint;

(b)     Award Plaintiffs actual, incidental and consequential damages in an amount to be proven at trial;

(c)     Award Plaintiffs punitive damages against the Defendants;

(d)     Award all reasonable costs incurred by Plaintiffs in connection with this Action, including attorneys' fees pursuant to applicable law;

(e)     Order an equitable accounting of all funds invested by Plaintiffs into TRC Funding; and

(f)     Award such other relief as the Court deems just and proper.

## **Demand for Jury Trial**

Plaintiffs demand trial by jury on all issues so triable.

WEINBERG, WHEELER,
HUDGINS, GUNN & DIAL, LLC

_/s/ Aaron M. Cohn_
Aaron M. Cohn
Florida Bar No. 95552
David I. Matthews, _admitted pro hac vice_
2601 South Bayshore Dr., Suite 1500
Miami, FL 33133
Ph.  (305) 455-9500
Fax (305) 455-9501
acohn@wwhgd.com
dmatthews@wwhgd.com

_Attorney for Kevin Friedman, Vijay Patel,_
_Jonathan Schoeff, Michael Schoeff and_
_George Skaff_

# EXHIBIT 1

**Guaranty**

April 17, 2017

Ladies and Gentlemen:

Reference is made to the Private Placement Memorandum and the Exhibits, dated January 31, 2017 ("Memorandum"), issued by TRC Funding Group No. 1 LLC ("TRC") to prospective investors, and which is attached hereto as Exhibit "A".

Effective from the date hereof, the undersigned, Mitchell Hammer, on behalf of Key Legal Services LLC ("KLS"), as its Chief Executive Officer, hereby asserts that BASL elects to be a "Guarantor" of the faithful performance of the financial commitments and obligations by TRC Funding Group No. 1 LLC to each investor who subscribes and purchases Preferred Series A Units, Preferred Series A-IRO Units, Preferred Series B Units and/or Preferred Series C Units ("Investor") pursuant to the terms set forth in the Memorandum and corresponding accepted Subscription Agreements with each Investor.

BASL confirms that it currently has a docket of approximately 12,500 transvaginal cases and 2,500 other cases, including but not limited to Xarelto, Pradaxa, Risperdahl, IVC blood clot filter, Talc Powder, Invokana and Benicar, thousands of which are currently in various stages of the settlement process for its clients.

Without limiting the generality of the foregoing, BASL hereby agrees to perform all the obligations of a Guarantor to TRC's financial obligations to each Investor, to the same extent and with the same force and effect as if the undersigned were the issuer of the Memorandum and accepted each Investor's Subscription Agreement.

The undersigned acknowledges that this Guaranty shall be effective upon its execution and delivery by the undersigned to TRC. Further, it shall not be necessary for Guarantor to execute this Agreement for each Investor that receives a copy of this Guaranty. This Agreement shall be construed in accordance with and governed by the laws of the State of Florida.

Very truly yours,

Mitchell Hammer
Chief Executive Officer
Key Legal Services LLC
1000 Corporate Drive
Suite 500
Fort Lauderdale, FL 33334

Notary Public State of Florida
Heidi Laub
My Commission FF 206?37
Expires 03/05/2019

EXHIBIT "A"

# PRIVATE PLACEMENT MEMORANDUM

# TRC FUNDING GROUP NO.1 LLC

Effective January 26, 2017

## **Table of Contents**

The Company ................................................................................................................................ 4

Business of the Company ............................................................................................................... 4

The Industry and History of Mass Torts ....................................................................................... 5

Multi-District Litigation (MDL) .................................................................................................... 6

The Group's History - Law Firm Headquarters, LLC ................................................................. 10

Law Firm Headquarters, LLC Financial Statements ................................................................... 11

Facilities ...................................................................................................................................... 11

Management ................................................................................................................................. 12

Risk Factors ................................................................................................................................ 14

Use of Proceeds ........................................................................................................................... 16

The Offering ................................................................................................................................ 16

EXHIBIT A: SUBSCRIPTION AGREEMENT (U.S. INVESTORS) ......................................... 19

EXHIBIT B: SUBSCRIPTION AGREEMENT (FOREIGN INVESTORS) ............................... 25

INVESTMENT REPRESENTATION LETTER (FOREIGN INVESTORS) ............................... 33

EXHIBIT C: PURCHASER QUESTIONNAIRE ........................................................................ 37

EXHIBIT D: SHAREHOLDER/MEMBER AGREEMENT ....................................................... 41

The following is a summary of certain information contained in this Confidential Private Placement Memorandum ("the Memorandum"), dated January 24, 2017 and is qualified in its entirety by the more detailed information appearing in additional documents. Each prospective investor is urged to read this Memorandum in its entirety.

## The Company

TRC Funding Group No. 1 LLC (the "Company") is organized in the state of Florida, United States of America effective January 1, 2017. The offices of the Company are located at 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL 33334. The Company's telephone number is (954) 280-0386.

## Business of the Company

The Company is in the business of funding, with investors' capital, the costs of the plaintiffs' case management, medical record retrieval and nurse review in ***mass tort cases,*** including transvaginal mesh, Xarelto, Pradaxa, Risperdal, IVC blood clot filter, Invokana, Benicar, talc powder and others, until those cases are brought to resolution, which saves plaintiffs' law firms and their providers from advancing those funds.

When the cases settle, the law firm will receive the settlement amount of funds from the manufacturer. From those settlement funds, the law firm(s) will pay to the plaintiffs sixty percent (60%) less amounts due for "recoverable costs" (e.g. medical records case management, retrieval and review costs) including all amounts due to the Company. After subtracting the recoverable cost amount due to the Company from each case resolution, the law firm(s) will pay the Company those amounts. The remaining forty percent (40%) of the settlement amount will be split between the law firms which co-counsel each case. Notwithstanding, the legal fee percentage splits could be modified from sixty percent (60%) to the plaintiff and forty percent (40%) to the law firms for any number of reasons.

The Company is offering investors an opportunity to purchase up to three hundred (300) Preferred Units for three million U.S. dollars (US$3,000,000) in the aggregate which they will purchase for ten thousand U.S. dollars (US$10,000) per Preferred Unit.

The three hundred (300) Preferred Units will be offered as follows:

    (i)      fifty (50) Preferred Series A Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than twelve (12) months and one (1) day from the date the investor's subscription is accepted by the Company;

    (ii)     one hundred fifty (150) Preferred Series A-IRO (interest roll-over) Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than

twelve (12) months and one (1) day from the date the investor's subscription is accepted by the Company.  At the time of redemption, the Company shall distribute ten thousand U.S. dollars (US$10,000) to the investor and then shall roll over the return amount of ten thousand U.S. dollars (US$10,000) per Unit into the equivalent of either Preferred Series B Units or Preferred Series C Units, as the investor shall determine and advise the Company in writing no later than twenty (20) days prior to the redemption date;

(iii)    fifty (50) Preferred Series B Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than twenty-four (24) months from the date the investor's subscription is accepted by the Company.  In addition, investors who purchase Preferred Series B Units will receive semi-annual payments of interest calculated at eighteen percent (18%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company;

(iv)    fifty (50) Preferred Series C Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than thirty-six (36) months from the date the investor's subscription is accepted by the Company.  In addition, investors who purchase Preferred Series C Units will receive quarterly payments of interest calculated at twenty-four percent (24%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company.

Subject to availability of Preferred Series A, A-IRO, B and C Units and acceptance by the Company, investors may purchase any quantity of Preferred Series A, A-IRO, B or C Units or any combination thereof.

The Company may, in its sole and absolute discretion, elect to increase the Offering for investors to purchase up to five hundred (500) Preferred Units, in any combination of Preferred Series A, A-IRO, B and C Units, for five million U.S. dollars (US$5,000,000). (See "The Offering" below.)

## <u>The Industry and History of Mass Torts</u>

A mass tort happens when a number of cases from asbestos to tobacco to pharmaceutical products are consolidated in a single court with multiple named plaintiffs and defendants and evidence is shared between the cases in both state and federal courts.

Mass tort claims find their origins as far back as the late 1960's and early 1970's, when lawyers represented passengers in plane crashes against a myriad of defendants including manufacturers, suppliers and the airline companies themselves. Due to the complexity of mass tort litigation, it is an area of the law which

requires attorneys to handle several major issues simultaneously. Mass tort litigation is a growing area of the law, which shows no signs of slowing down in the near future.

Perhaps the most notable and well-known mass tort cases involved asbestos litigation which have their genesis in the 1970's. Due to the endless list of asbestos-containing products and a large number of companies involved in the manufacturing and distribution of these products, asbestos personal injury litigation seemed to be practically unlimited.

Today, mass tort product liability litigation spans a wide range of mass tort product liability litigation for a broad spectrum of health products including contraceptives and hormone therapies, surgical mesh, diabetes medications, defibrillators, antidepressants, orthopedic implants, diet drugs, vaccines, over-the-counter medicines, heart valves, bone screws, latex gloves, biologics and many others with over 16 million lawsuits filed in the United States every year and millions of others not filed but settled.

The pain and suffering these faulty medical devices and pharmaceuticals can cause is almost unimaginable. People who have been harmed by these devices have a right to seek compensation for their injuries. The Group (defined below; see **"Other Affiliated Entities Critical to the Company's Business."**) plays an important role in assisting law firms to obtain that compensation.

Implanted medical devices, such as pacemakers, hip replacements, pain pumps, and transvaginal mesh have revolutionized the way medicine is practiced. Countless Americans have had medical devices implanted directly into their bodies. However, when these medical devices fail, the potential for harm is significant. Patients are faced with the choice of additional, painful surgeries to remove and replace the implanted device or the uncertainty of living with a defective device inside their bodies. The Group provides services to highly experienced lawyers from across the U.S. with proven track records as sophisticated litigators with a wide range of experience in matters primarily helping women, though some involve men, to resolve complex disputes in litigation focused on pharmaceuticals and medical devices.

## Multi-District Litigation (MDL)

Due to the significant volume of mass tort cases, they are often organized as a Multi-District Litigation ("MDL"). An MDL is a provision of the U.S. Code (28 U.S.C. section 1407(a)) that permits the pre-trial proceedings in different legal actions to be consolidated. The chief requirements for MDL designation are: the different actions must share one or more alleged events, circumstances or characteristics to be resolved at trial, the consolidation must promote convenience for the involved parties and witnesses and the

consolidation must promote justice and efficiency by eliminating overlapping or duplicative discovery. An MDL differs from a class action lawsuit.

> *"Class action lawsuits form when individuals harmed by a drug or device combine cases into a single lawsuit. Multidistrict litigation cases occur when a panel transfers individual cases to a single court, but the cases are not combined into a single lawsuit." (https://www.drugwatch.com/class-action-lawsuits-vs-multidistrict-litigation-mdl/)*

**Other Affiliated Entities Critical to the Company's Business**

Several affiliated entities – Smart Legal Solutions LLC, Law Firm Headquarters LLC, Key Legal Services LLC and The Record Company, LLC (collectively the **"Group"**) --- have combined their efforts and resources to become one of the largest service providers offering a broad range of legal case processing and plaintiff support services including, but not limited to client intake and retainer procurement, case management, medical record retrieval and nurse review to law firms involved in the mass tort industry.

**Law Firm Headquarters LLC ("LFHQ")** a Nevada limited liability company formed on December 19, 2014, has been a pre-eminent legal marketing and support organization that has provided unique and comprehensive services including direct response advertising, coupled with legal support services, while employing a top-of-class technology platform for a group of highly reputable and experienced attorneys engaged in mass tort cases. (See below "The Group's History.") LFHQ developed a case docket of approximately 14,000 transvaginal mesh cases for law firms which sold their areas of practice for approximately $40 million, which netted LFHQ with a $17 million profit for calendar year 2015, for the administrative and case management services it rendered those law firms. Effective January 1, 2017, the majority stake in LFHQ subject to further due diligence may be acquired by Key Legal Services, LLC (See "Key Legal Services, LLC" and "Financial Statements" below).

**Key Legal Services, LLC ("KLS")**, a District of Columbia limited liability company formed on August 1, 2016, enters into a Fee Services Agreement with law firms and indirectly with their co-counsel to provide services including new client intake processing and retainer procurement, followed by case management and medical record retrieval, culminating in nurse review and a medical record proof packet which the law firm(s) may use for settlement discussions with defendant manufacturers. Currently, KLS has entered into a Fee Service Agreement with Bramzon & Associates Specialty Litigation LLC (**"BASL") and other law firms ("Law Firms")** to further develop and prove up to approximately 12,600 transvaginal mesh cases and an assorted 2,500 cases of Xarelto, Pradaxa, Risperdal, IVC Blood Clot filter and others.

**Smart Legal Solutions LLC ("SLS"),** a Florida limited liability company formed on January 17, 2017, is the parent company of Key Legal Services LLC, The Record Company LLC and TRC Funding Group No. 1 LLC.

Notwithstanding the breadth of services included in the Fee Services Agreement, KLS focuses on its core competency – communication with contracted Law Firms and client support services. In addition, KLS has outsourced the case management, medical record retrieval and nurse review functions and by contracting with its affiliate The Record Company LLC (see below) for those services. However, the Law Firm is contractually required to pay KLS and KLS is contractually required to pay The Record Company for services rendered regardless of whether plaintiffs' cases are resolved favorably.

To further grow its business, KLS has reached an agreement to acquire the controlling membership stake in LFHQ, effective January 1, 2017 for cash and a promissory note subject to due diligence and documentation. Following the acquisition, LFHQ will be a majority-owned subsidiary of KLS.

KLS projects to intake and manage a range of cases during the years of 2017, 2018 and 2019 as set forth in the table below. Depending on the case type and the amount of work requested by the law firm(s), KLS could generate revenues ranging from $1,000 to $5,000 per case which would be paid by the Law Firm(s) as marketing/intake contributions. These revenues typically _exclude_ costs for case management, medical record retrieval and nurse review, which collectively are "recoverable costs" from the client portion of case settlements.

| Calendar Year | Projected No of Cases – Low End of Range | Projected No of Cases – High End of Range | Projected Revenues based on Low End of Quantity Range | Projected Revenues based on High End of Quantity Range |
|---|---|---|---|---|
| 2017 | 25,000 | 50,000 | $25,000,000 to $125,000,000 | $50,000,000 to $250,000,000 |
| 2018 | 25,000 | 75,000 | $25,000,000 to $75,000,000 | $75,000,000 to $375,000,000 |
| 2019 | 25,000 | 100,000 | $25,000,000 to $100,000,000 | $100,000,000 to $500,000,000 |

**The Record Company, LLC,** a Florida limited liability company formed on August 5, 2016, entered into an exclusive Services Agreement with Key Legal Services, LLC, an affiliate, to provide case management, medical record retrieval and nurse review services which culminate in a medical record proof packets that KLS can provide to the law firm(s) which they may use for settlement discussions with defendant manufacturers.

On December 19, 2016, TRC finalized an agreement with KCC Class Action Services, LLC, a Computershare Limited company, which is a publicly traded company on the Australian Stock Exchange ("KCC") whereby KCC will provide TRC with mass tort administration services which may include intake and data management, retainer procurement, client data collection, document processing and review, preparation of Plaintiff Fact Sheets, lien resolution, medical records review and related administrative services for thousands of cases, though the maximum number of cases has not yet been determined. The agreement requires TRC to pay KCC for its services within thirty (30) days of when cases resolve, which depending on the mass tort case type, could be up to four (4) years from the date KCC services are rendered if the resolution is favorable; otherwise, TRC must pay KCC a substantially reduced fee for disqualified cases. On average, the TRC cost for KCC services is approximately two thousand U.S. dollars (US$2,000), which includes the cost of case administration and financing. For every 1,000 cases for which KCC provides its services, TRC saves approximately $2,000,000 of vendor and financing costs and does not have to charge KLS.

In addition to its relationship with KCC, TRC has a network of vendors that provide case management, medical record retrieval and nurse review services. Currently, TRC is typically required to pay these vendors within 30-90 days from invoice date with a few offering extended terms. Terms vary by vendor. On average, the TRC cost of the non-KCC vendor services is approximately one thousand U.S. dollars (US$1,000). For every 1,000 cases for which non-KCC vendors provide their services, TRC pays those vendors and charge KLS approximately $1,000,000.

Based on its recent agreement with TRC, the Company may advance to TRC, in $1,000 increments, up to five million U.S. dollars (US$5,000,000) to finance the administrative and case management costs for those proven cases by TRC. When the Company finances the administrative and case management costs, TRC shall secure the Company with a collateral interest in those recoverable costs from the clients' settlements. At resolution, the Company shall receive two thousand U.S. dollars (US$2,000) or more per case as the

total recoverable costs including financing charges. This arrangement, not unlike the KCC agreement, could save TRC and KLS millions of dollars.

The table below depicts the projected range of the number of cases for 2017, 2018 and 2019, each of which may require three or more medical records. In addition, the table indicates the amount of capital, based on one thousand U.S. dollars (US$1,000) per case to fund the low and high end of the range of projected cases for each year.

| Calendar Year | Projected No of Cases – Low End of Range | Projected No of Cases – High End of Range | Capital Required to Fund The Record Company Costs @Low End of Quantity Range (at $1,000/case) | Capital Required to Fund The Record Company Costs @High End of Quantity Range(at $1,000/case) |
|---|---|---|---|---|
| 2017 | 25,000 | 50,000 | $25,000,000 | $50,000,000 |
| 2018 | 25,000 | 75,000 | $25,000,000 | $75,000,000 |
| 2019 | 25,000 | 100,000 | $25,000,000 | $100,000,000 |

Clearly, the Group lacks sufficient internal capital to fund the volume of business it seeks to achieve during the three year period and thus, the reason that The Record Company LLC contracted with the Company to finance the administrative and case management costs of the mass tort cases. Even if all of the five hundred (500) Preferred Units in this Offering are purchased by investors providing the Company increases the size of the Offering from three hundred (300) Preferred Units, the five million U.S. dollars raised will only fund the administrative and case management costs for five thousand (5,000) of TRC's caseload of more than 12,600 transvaginal mesh cases and 2,500 assorted other case types.

**The Group's History - Law Firm Headquarters, LLC**
**DETAILED RESULTS FOR INITIAL TRANSVAGINAL MESH ("TVM") DOCKET DEVELOPED FROM JULY 2014 THROUGH MAY 2015**

✓ LFHQ developed a docket of 14,147 TVM Clients for four law firms over a 12-month process (July 2014 through May 2015)
✓ LFHQ funded the development of the 14,147 TVM case docket with $7.4MM equity and $8.9MM in collateralized debt

- ✓ Following six weeks of due diligence with a staff of 25 contract attorneys, the law firms for which LFHQ developed the 14,147 cases, sold this docket to a nationally recognized law firm at a considerable multiple of cost – approximately $40MM
- ✓ These contract attorneys reviewed the Retainer Agreement, contact information, and medical record case history for each of the 14,147 clients and made telephonic contact with 70% of the clients. As a result of their due diligence, they accepted 96.4% of the cases.

**Summary Results of Initial TVM Docket Transaction**

- ✓ Generated Cases: 14,147
- ✓ Accepted Cases: 13,643
- ✓ Accepted Rate: 96.4%
- ✓ Cost of Acquisition / Case: $1,175
- ✓ Sale Price / Case: $2,900
- ✓ Total Sale Price: $39.5 MM
- ✓ Total Cost of Acquisition: $16.3 MM
- ✓ Debt: $ 8.9 MM
- ✓ Equity: $ 7.4 MM
- ✓ IRR (within 12 months): 240%+

LFHQ reinvested the majority of its profits from the initial transvaginal mesh transaction described above into the services it provided the law firms. Though LFHQ is no longer providing services to the law firm(s) LFHQ has substantial accounts receivable due from the law firm(s). In mid-2016, the Law Firm(s) contracted with KLS to provide administrative and case management services for those cases which LFHQ did not complete and which had not been delivered to the Law Firms ready for settlement.

**Law Firm Headquarters, LLC Financial Statements**

LFHQ's Income Statement, as prepared by management, for the calendar year 2015 and for the period July 1, 2014 (inception) through December 31, 2014 are below:

| INCOME STATEMENT (ALL FIGURES IN USD) | | |
|---|---|---|
| | For the period Jan 1, 2015 through Dec 31, 2015 | For the period Jul 1, 2014 (inception) through Dec 31, 2014 |

| Ordinary Income/Expense | | |
|---|--:|--:|
| Income – Legal Svcs. | 57,546,500 | 14,820,500 |
| Cost of Goods Sold | <u>34,097,119</u> | <u>5,711,455</u> |
| **Gross Profit** | **23,449,381** | **9,109,045** |
| **Expenses** | | |
| Administrative | 474,159 | 286,853 |
| Occupancy | 562,397 | 24,658 |
| Labor | 4,430,983 | 1,451,814 |
| Sales Expense | 188,532 | 229,120 |
| **Total Expense** | **5,560,656** | **1,992,445** |
| Net Ordinary Income | 17,788,725 | 7,703,900 |
| Other Income/Expense | (227,442) | --- |
| **Net Income** | **<u>17,561,283</u>** | **<u>7,116,600</u>** |

KLS and TRC have been in operation for less than twelve months. As such, no financial information on these entities is available.

**Financing**

As of the date of this Offering, the Group finances itself with internal funds –i.e. $17MM of net income in calendar 2015 (see "Financial Statements" above) from the sale of the first TVM docket and, as such, does not have any private or institutional financing of any kind. Note, however, that LFHQ borrowed approximately ten million U.S. dollars (US$10,000,000) to finance the initial transvaginal mesh docket. The borrowed money was repaid as agreed.

Despite the Group's outstanding results, growth is limited by its capital constraints. If The Record Company LLC charges KLS approximately $1,000 per case for its administrative and case management services, and if financing costs needed to carry these costs until the case settles is an additional $1,000, that means that every 1,000 cases requires two million U.S. dollars (US$2,000,000) of funding; thus ten thousand (10,000) cases requires twenty million U.S. dollars (US$20,000,000).

Notwithstanding, the Company and/or any of the companies within the Group may, at any time, elect to seek private or institutional financing to finance its respective operations and growth.

**Facilities**

The Group including the Company, operates temporarily from offices located at 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL 33334 until its new corporate headquarters (i.e. to be known as Suite 610 in the same building) is constructed by the landlord for approximately 5,700 square feet. The Group will pay the Landlord a monthly rental of approximately ten thousand U.S. dollars (US$10,000) per month commencing on February 1, 2017 and then gradually increasing to approximately thirteen thousand U.S. dollars (US$13,000) per month over the four (4) year term. The Company will not be charged any rent for use of the Group's offices.

**Employees**

The Company has no employees.

**Management**

The following table sets forth certain information concerning the executive officers and directors of the Company:

| **Name** | **Age** | **Title** |
|---|---|---|
| Ghen Sugimoto | 36 | Manager |
| David Hammer | 34 | Manager |

**Ghen Sugimoto** co-founded the Company and serves as a co-Manager. Mr. Sugimoto is the beneficial owner of 37.5% of KLS, TRC and the Company through his ownership in Smart Legal Solutions LLC.

An engineer by training, a change agent by design, Ghen Sugimoto brings an analytical mind and tactical skillset to his role as Chief Operating Officer of The Record Company and Key Legal Services where he works closely with the executive team to design and implement effective strategies. Mr. Sugimoto has been instrumental in the development and management of over 30,000 mass tort claimants over a twenty-four month period. In addition to general operations, he has led business development and marketing efforts to broaden the law firm client base.

Mr. Sugimoto brings a decade of experience in building call center and direct marketing driven business operations, having held executive leadership positions across several dynamic industries, including: Chief Marketing Officer of ExpertPlanet, an innovative business process outsourcing firm serving client's such as eBay, PayPal, Nestle, Zumba, and Beachbody; Vice President of Marketing at iCan Benefit Group, a national consumer health insurance provider that he helped form and grow to $87 million in top-line revenue within three years; as well as, SVP and founding member of InteractiveMD, an early leader in telehealth.

Additionally, Mr. Sugimoto has diversified his skills by consulting in private industry and Florida International University, where he served as an advisory board member.

The early portion of Mr. Sugimoto's career as a biomedical manufacturing and quality assurance engineer at Cordis, a Johnson & Johnson subsidiary, helped shape his understanding of highly regulated work environments. He holds a Six Sigma Black Belt certification.

**David Hammer** co-founded the Company and serves as manager. Mr. Hammer is a beneficial owner of Hammer Capital Group LLC which owns sixty-two and one-half percent (62.5%) of the Company. In addition, Hammer Capital Group LLC beneficially owns 62.5% of KLS, TRC, and the Company through Smart Legal Solutions LLC. Separately, Mr. Hammer is co-founder of Elevant Solutions LLC, which provides accounting, human resource and data management services to the Group. Elevant Solutions LLC is also 62.5% owned by Hammer Capital Group LLC

Mr. Hammer earned a Bachelor of Science in Business Administration, with a major in Computer Science, from the University of Florida in 2002. In addition, Mr. Hammer earned his Juris Doctorate and Master of Laws in Taxation degrees from the University of Florida in 2005 and 2006 respectively, and he operated a law practice for four years. His law practice led him to a career in business, during which he served as an officer and director of private and public companies in North America, Europe, and Australia.

In 2012, Mr. Hammer joined Big Mouth Local, an Internet advertising and marketing firm, and currently serves as its Chief Information Officer. While at Big Mouth Local, Mr. Hammer identified a burgeoning need for custom cloud-based rapidly deployed database development. Then, Mr. Hammer identified and mastered the technology to fill that need, and built a team of talented and experienced database and web developers who have formed the core of Biz Data Systems Inc. when he formed that company.

Mr. Hammer has over 25 years programming experience, and has been programming in Microsoft Access for 20 years.

**Remuneration of Key Management**

The Managers have been elected by the Company to serve for a term of five (5) years expiring on December 31, 2021. The Managers shall receive an annual base consultancy fee of thirty thousand U.S. dollars (US$30,000) which shall be accrued and only paid by the Company after any redemption of investors' Preferred Units that is due, shall have been redeemed. In addition, Managers will each receive

additional compensation based on a performance incentive equal to ten percent (10%) of earnings in excess of the investors' return.

## Risk Factors

Investment in the securities offered hereby are speculative, involves a high degree of risk and should only be considered by those persons able to afford a loss of their investment. The following factors should be carefully considered in evaluating the Company and its business before purchasing the Units being offered hereby.

1. **Limited Operating History.** The Company, which was organized in the state of Florida effective January 1, 2017, has limited operating history. The Company's operations are subject to all risks inherent in the assumption of the operations of existing enterprises comprising the Group or otherwise. No assurance can be given that the Group or any companies comprising the Group will be able to continue operations; and accordingly, the stakeholders may lose all or a substantial portion of their investment.

2. **Lack of Arm's Length Contractual Relationships.** The Company has entered into an agreement with The Record Company LLC. From time to time, the Company may decide to enter into, alter or modify this or other agreements with affiliates or its principals. Though such contractual relationships are intended to be commercially reasonable transactions, they may not be the result of arm's length negotiations.

3. **Limited Transferability of Securities.** The transferability of the shares of the Company's capital stock offered herein is severely restricted. This is no public trading market for such Units as of the date of this Memorandum. It is highly unlikely the public market will develop for such shares at any time in the future. As a result, holders of such Units may not be able to liquidate their investment or use the Units as collateral for loans in the event of an emergency or for any other reason. The Company will not be required to repurchase or redeem any Units. An investment in the company is a non-liquid investment. Each person acquiring a Unit will be represent to represent that he or she is purchasing it for his or her own account, for investment, and not with a view for resale or distribution. None of the

Units, or the underlying units of capital stock, have been registered under the Securities Act of 1933, and therefore cannot be sold unless they are subsequently registered under the Securities Act of 1933 or in the opinion of the company's counsel, an exemption of such registration is available and with the consent of the Company. A restrictive legend reflecting the foregoing will appear on the certificates for the Units.

4.  **Conflict of Interest.** To the extent that management is engaged in other business activities, they may have possible conflicts of time and of interest in diverting opportunities to other companies, entities, or persons with which they are or may be associated or have an interest, rather than spending time with and diverting such opportunities to the Company. No assurance can be given that such potential conflicts of interest will not cause the Company to lose potential opportunities. In such event, the terms of such opportunities may not be the result of arm's length negotiations.

5.  **Arbitrary Determination of Offering Prices.** The offering price for the units underlying the Preferred Units offered hereunder has been determined solely by the management of the Company and does not bear any relationship to book value, anticipated earnings or any other recognizable criteria of value. The offering price set forth herein should not be considered an indication of the actual or anticipated value of the Units.

6.  **Cases May Not Favorably Resolve.** The Company is effectively investing money into The Record Company LLC which has already or will perform mass tort administrative services for plaintiffs' cases. Despite the information garnered from plaintiffs' medical records, for any of many reasons, the law firm(s) may not settle the plaintiffs' cases. These reasons may include, but are not limited to (i) defendants going bankrupt or out of business, (ii) settlement terms may not be agreed, (iii) the administrative services performed may not be timely or accurately and/or (iv) uncured defaults by Law Firms in any agreement to which they are a party that could adversely impact the favorable resolution of the plaintiffs' case. If the plaintiffs' cases do not settle, the investors' may not recover their investment in whole or in part.

7.  **Insufficient Funds to Redeem Preferred Units.** For any of several reasons, the Company may not have sufficient funds to redeem all of the Units when required.

8.  **Statute of Limitations (SOL) issues can exist in certain TVM or other types of cases at this stage.** Given that the SOL date of any given case can be effected by several factors including FDA warning

dates, adverse event dates, as well as other considerations, it is extremely important that we continue to monitor developments in the overall litigation.

9. **Liabilities of TVM or other case claims could exceed small manufacturers' assets.** There is a chance that the liabilities created from TVM claims could exceed some of the smaller defendant manufacturers' assets. If this were to occur, these smaller manufacturers could declare bankruptcy. If any defendant declared bankruptcy, its assets would be liquidated to satisfy its liabilities, and any shortfall could adversely affect the average settlement values for that defendant.

## Use of Proceeds

The Company's estimate of the net proceeds to be realized from the sale of Units offered hereby will total a maximum of three million U.S. dollars (US$3,000,000) (unless the Company elects to increase the Offering to five million U.S. dollars (US$5,000,000)) before deducting for approximately twenty-five thousand U.S. dollars (US$25,000) of expenses incurred in conjunction with this Offering assuming no commissions are paid to licensed broker dealers. The net proceeds realized from this Offering will be used by the Company for working capital and to finance the administrative and case management costs of plaintiffs' mass tort cases. **See "Business of the Company."**

## The Offering

### Description of the Offering

The Company is offering investors the opportunity to purchase up to a maximum of three hundred (300) units for an aggregate of three million U.S. dollars (US$3,000,000), with a minimum purchase of one (1) unit. **Each unit consists of ten (10) Series A, A-IRO, B or C - Redeemable Preferred Units, at a purchase price of Ten Thousand U.S. Dollars (US$10,000.00) ("Preferred Unit" or "Unit")**.

The three hundred (300) Preferred Units will be offered as follows:

(i)      fifty (50) Preferred Series A Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than twelve (12) months and one (1) day from the date the investor's subscription is accepted by the Company;

(ii)     one hundred fifty (150) Preferred Series A-IRO (interest roll-over) Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than twelve (12) months and one (1) day from the date the investor's subscription is accepted by the Company.  At the time of redemption, the Company shall distribute ten thousand U.S. dollars (US$10,000) to the investor and then shall roll over the return amount of ten thousand U.S. dollars (US$10,000) per Unit into the equivalent of either Preferred Series

> B Units or Preferred Series C Units, as the investor shall determine and advise the Company in writing no later than twenty (20) days prior to the redemption date;

(iii)     fifty (50) Preferred Series B Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than twenty-four (24) months from the date the investor's subscription is accepted by the Company.  In addition, investors who purchase Preferred Series B Units will receive semi-annual payments of interest calculated at eighteen percent (18%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company;

(iv)     fifty (50) Preferred Series C Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than thirty-six (36) months from the date the investor's subscription is accepted by the Company.  In addition, investors who purchase Preferred Series C Units will receive quarterly payments of interest calculated at twenty-four percent (24%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company.

Subject to availability of Preferred Series A, A-IRO, B and C Units and acceptance by the Company, investors may purchase any quantity of Preferred Series A, A-IRO, B or C Units or any combination thereof.

The Company may, in its sole and absolute discretion, elect to increase the Offering for investors to purchase up to five hundred (500) Preferred Units for five million U.S. dollars (US$5,000,000). **The redemption of the Preferred Units have a priority over any other redemption or distribution of profits to common stakeholders. Nonetheless, the Preferred Units do not have voting rights.**

The one hundred percent (100%) return offered investors herein is in contrast of the Company's contemplated program which provides a yield of a 100% return on capital over four (4) years --- i.e. approximately twenty-five percent (25%) per year. However, despite the Company's contemplated typical four (4) year program, the Company is offering investors the opportunity to finance administrative and case management costs for transvaginal mesh cases which the Company believes will resolve within the next 12 to 18 months. Because of this projected timeline, investors may realize a substantially greater return on capital.

For every ten thousand U.S. dollars (US$10,000) invested in the Company by investors, the Company will invest the same amount in TRC to cover the administrative and case management costs for ten (10) transvaginal mesh cases. Therefore, if investors purchase the three hundred (300) Preferred Units offered

18

herein by the Company, the Company will invest those funds in TRC which will cover two thousand (2,000) cases of the approximate 12,600 transvaginal mesh cases and 2,500 assorted other case types in the Law Firms' current docket for which TRC provides administrative and case management services.

In the event that all of the three hundred (300) Units are purchased by one or more investors, the Company will receive three million U.S. dollars (US$3,000,000) before deducting expenses. In the event, investors purchase all of the available Units, the Company shall be required to redeem those Preferred Units for six million U.S. dollars (US$6,000,000). If the Company elects to increase the Offering for investors to purchase a maximum of five hundred (500) Preferred Units, the Company would receive five million U.S. dollars (US$5,000,000) before deducting expenses and be required to redeem those Preferred Units for ten million U.S. dollars (US$10,000,000).

The Units are being offered by the Company. There will be no commission, compensation or other remuneration for the sales activities to anyone. However, the Company reserves the right to compensate any licensed broker-dealer for efforts resulting in the sale of one or more Preferred Units. A licensed broker dealer shall receive an eight percent (8%) commission in the event his or her efforts result in the sale of any number of Units.

Each prospective investor will be admitted as a stakeholder of the Company as soon as reasonably practicable after the Company has determined whether a prospective investor qualifies to invest in the Company. It is anticipated that this determination will be made within a maximum of ten (10) days from the date that the Company receives each investor's Subscription Agreement and Purchaser Questionnaire. Subscriptions are subject to acceptance by the Company and may be rejected, in whole or in part, in its sole and absolute discretion. In the event that any subscription is not accepted by the Company, all funds associated with that subscription, will be promptly returned, without interest, to the respective subscriber.

The shares of the Company's underlying the Units may be transferred only in accordance with the terms of the Shareholders Agreement. The Company has a right of first refusal with respect to all transfers of Preferred Units purchased in this Offering, except with respect to transfer to a stakeholder's spouse or lineal descendant.

**A subscriber who wishes to invest in the Company must deliver the following completed and signed items to the Company:**

(a) Subscription Agreement (see Exhibit "A" for U.S. investors);

(b)  Subscription Agreement (see Exhibit "B" for foreign investors);

(c)  Purchaser Questionnaire (see Exhibit "C");

(d)  Operating Agreement (see Exhibit "D");

(e)  A wire transfer or check payable to "TRC Funding Group No. 1 LLC." for the full amount of the Units to be purchased.

**Rescission Right**

Section 517.061(12) of the Florida Investor Protection Act grants each Investor the absolute and unqualified right to cancel and void his or her purchase of the securities described herein, and to receive back without forfeiture or penalty of any kind, all sums paid or delivered to the Company (the "Rescission Right"). The Rescission Right must be exercised within three (3) days after the later of (i) receipt of this Memorandum or (ii) the first tender of consideration made by a prospective investor to the Company. **See "Subscription Agreement" – Exhibit "A".**

EXHIBIT A: SUBSCRIPTION AGREEMENT (U.S. INVESTORS)

**TRC FUNDING GROUP NO. 1 LLC**

Mr. Ghen Sugimoto, Manager

Mr. David Hammer, Manager

TRC Funding Group No. 1 LLC

1000 Corporate Drive

Suite 500

Fort Lauderdale, FL 33334

Dear Mr. Sugimoto and Mr. Hammer:

1.  The undersigned hereby offers to subscribe for the following securities (the "Securities") of TRC Funding Group No. 1 LLC, a Florida limited liability company (the "Company") for a price of

US$ _____, for the purchase of:

_____ Preferred Series A Units, each of which consists of ten (10) of the Company's preferred units (the "Preferred Units") at a price of ten thousand U.S. dollars

(US$10,000), redeemable no later than twelve (12) months and one (1) day from the date the subscription is accepted by the Company;

_____ Preferred Series A-IRO (interest roll-over) Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than twelve (12) months and one (1) day from the date the investor's subscription is accepted by the Company.  At the time of redemption, the Company shall distribute ten thousand U.S. dollars (US$10,000) to the investor and then shall roll over the return amount of ten thousand U.S. dollars (US$10,000) per Unit into the equivalent of either Preferred Series B Units or Preferred Series C Units, as described herein, as the investor shall determine and advise the Company in writing no later than twenty (20) days prior to the redemption date;

_____ Preferred Series B Units, each of which consists of ten (10) of the Company's Preferred Units at a price of ten thousand U.S. dollars (US$10,000), redeemable for twenty thousand U.S. dollars (US$20,000) no later than twenty-four (24) months from the date the subscription is accepted by the Company; plus semi-annual payments of interest calculated at eighteen percent (18%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company;

_____ Preferred Series C Units, each of which consists of ten (10) of the Company's Preferred Units at a price of ten thousand U.S. dollars (US$10,000), redeemable for twenty thousand U.S. dollars (US$20,000) no later than thirty-six (36) months from the date the subscription is accepted by the Company; plus quarterly payments of interest calculated at twenty-four percent (24%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company.

2.  All funds received from the undersigned will be deposited by the Company into its operating bank account at Chase Bank N.A. I understand that the Company will have the right to immediately use any funds it receives from investors who are accepted into this offering.

WIRE INSTRUCTIONS:

|  |  |
|---|---|
| Bank: | Chase Bank N.A. |
|  | 5305 Ehrlich Road |
|  | Tampa, FL 33625 |
| Routing No: | 267084131 |

Account Name: TRC Funding Group No. 1 LLC

1000 Corporate Drive, Suite 500

Fort Lauderdale, FL 33334

Account No.:   102975528

3. This Offering will expire on March 31, 2017 unless otherwise extended by the Company.

4. To induce the Company to accept this subscription, the undersigned hereby represents and warrants that:

    a.  The information provided to the Company in the questionnaire accompanying this subscription, or previously furnished by the undersigned to the Company, and any other information provided to the Company by the undersigned, is true and correct in all respects as of the date hereof (or, if there have been any changes in such information since the date that such information was furnished to the Company, the undersigned has advised the Company in writing of such changes).

    b.  The address set forth below is the true residence of the undersigned, and he has no present intention of becoming a resident of any other state or jurisdiction.

    c.  The undersigned has received and reviewed carefully the Memorandum which was previously furnished to the undersigned by the Company and of which this agreement is an exhibit.

    d.  The undersigned has examined or has had an opportunity to examine before the date hereof such information concerning the Company and the offering of the Securities hereby subscribed as is (i) relevant to this transaction, and (ii) possessed by the Company or can be acquired by it without unreasonable effort or expense.

    e.  The undersigned has had an opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company, concerning the terms and conditions of this investment, and all such questions have been answered to the full satisfaction of the undersigned.

    f.  The undersigned has such knowledge and experience in financial and business matters that he (or they together) are capable of evaluating the merits and risks of an investment in the Company.

    g.  The undersigned does not intend or anticipate that this investment be a source of income, and the undersigned is able to bear the substantial economic risks of the

investment in the Company being made by the undersigned and at the present time could afford a complete loss of such investment.

h.   The undersigned has adequate means of providing for his current needs and possible personal contingences and he has no need for liquidity of his investment in the Company and has either (i) individual income of more than Two Hundred Thousand ($200,000) Dollars in each of the two (2) most recent years, or joint income of more than Three Hundred Thousand ($300,000) Dollars when income of spouse is taken into account, and reasonably expects to reach the same income level in the current year; (ii) net worth, or joint net worth with spouse, which at the time of his investment exceeds One Million U.S. Dollars (US$1,000,000).

i.   The undersigned understands that the Securities subscribed for hereby have not been registered under the Securities Act of 1933 and are sold in reliance on an exemption thereunder for intrastate sales, have not been approved or disapproved by the Securities and Exchange Commission or by any other Federal or state agency. A RESALE OF THE SECURITIES SUBSCRIBED FOR HEREUNDER CANNOT OCCUR UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNLESS AN EXEPTION FOR SUCH RESALE EXISTS.

j.   The undersigned is a full-time Florida resident or resident of such other state as the Company may extend this Offering into, and is acquiring his Securities hereunder for his own account for investment purposes only and not with a view to the sale or other distribution thereof, in whole or in part.

k.   The undersigned understands that:

   i.   The Securities are speculative and involve a certain degree of risk.

   ii.   The Company has a very limited financial and operating history.

   iii.   There are substantial restrictions on the transferability of the Securities subscribed for hereunder, and purchasers of the Securities have no rights to require the Securities to be registered under the Securities Act of 1933; there will be no public market for the Securities; and, accordingly, it may not be possible for him to liquidate his investment in the Company.

The foregoing representations and warranties are true and accurate as of the date hereof.

EACH RESIDENT OF FLORIDA WHO SUBSCRIBES FOR SECURITIES HEREUNDER HAS THE RIGHT, PURSUANT TO SECTION 517.061(11) OF THE STATUTES OF FLORIDA, TO WITHDRAW

HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL ONIES PAID WITHIN THREE (3) DAYS AFTER RECEIPT OF THE DISCLOSURE LETTER OR WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF MONEY OR OTHER CONSIDERATION FOR SECURITIES SUBSCRIBED TO HEREUNDER TO THE COMPANY OR AN AGENT OF THE COMPANY, WHICHEVER OCCURS LATER.

5. The undersigned acknowledges that he understands the meaning and legal consequences of the representations and warranties contained in Paragraph 4 hereof, and he hereby agrees to indemnify and hold harmless the Company from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of the undersigned, whether contained in the Questionnaire or this Subscription Agreement. Notwithstanding any of the representations, warranties, acknowledgments or agreements made herein by the undersigned, the undersigned does not thereby or in any other manner waive any rights granted to him under Federal or State securities laws.

6. It is understood that this offer to subscribe is not binding on the Company until the Company accepts it, which acceptance is at the sole discretion of the company, by executing this Subscription Agreement where indicated. If any portion of the offer to subscribe is not accepted, the Company shall return to the undersigned on a pro rata basis any monies received by it that are not applied to the accepted portion of the offer to subscribe to Securities. The Subscription Agreement shall be null and void if the company does not accept it on or before March 31, 2017 unless such date is extended by the Company. If such acceptance is not timely secured, the Company shall return to the undersigned any and all monies received without interest, and without deduction for any costs, and the Company and the undersigned shall have no further obligation to each other hereunder.

7. (a) This subscription is not transferable or assignable by the undersigned.

(b) All notices or other communications to be given or made hereunder shall be in writing and shall be delivered personally or mailed, by registered or certified mail, return receipt requested, postage prepared, or by rpost.com (certified email) at the relevant address set forth herein, or at such other address as shall have been furnished to the Company by notice from the scriber or to the Company at:

TRC Funding Group No. 1 LLC

1000 Corporate Drive

Suite 500

Fort Lauderdale, FL 33334 USA

or at such other address as shall have been furnished to the subscriber by notice from the Company.

**IN WITNESS HEREOF,** the undersigned has executed this Subscription Agreement this ___ day of _____, 201_ .

**PURCHASER:**

_____

_____

(Signature(s)

(Please print information below exactly as you wish it to appear in the records of the Company.)

_____

_____

Name and capacity in which subscription is made.

**ADDRESS:**

_____

Number and Street

_____

City          State          Zip Code

_____

Social Security Number of Individual – OR –

25

Other Taxpayer Identification Number

_____

_____

Address for notices different from above

The foregoing subscription is hereby accepted by the Company this _____ day of _____, 201__.

TRC Funding Group No. 1 LLC

By: _____

Ghen Sugimoto, Manager

By: _____

David Hammer, Manager

## **EXHIBIT B: SUBSCRIPTION AGREEMENT (FOREIGN INVESTORS)**

**TRC FUNDING GROUP NO. 1 LLC**

**THIS   SUBSCRIPTION   AGREEMENT** dated   as   of   the   _____   day   of   _____, 201__, **BETWEEN**:

**TRC FUNDING GROUP No. 1 LLC**, a Florida (U.S.A.) limited liability company with an address at 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL 33334 U.S.A., (the "**Issuer**")

**AND:**

_____
Name of Purchaser

_____

Mailing Address

(the "**Investor**")

**WITNESS THAT WHEREAS:**

A.  The Issuer is subject to the regulatory jurisdiction of the U.S. Securities and Exchange Commission and any other securities commission of any State of the United States in which the shares of the Issuer are offered (collectively the "**Commissions**").

B.  The Investor has agreed to purchase shares of stock of the Issuer, expressed as "**Units**" in accordance with the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties agree as follows:

1.  **PURCHASE AND SALE OF UNITS**

1.1 The Investor hereby subscribes for and pays for in accordance with the terms of this Agreement:
_____ Preferred Series A Units, each of which consists of ten (10) of the Company's preferred units (the "Preferred Units") at a price of ten thousand U.S. dollars (US$10,000), redeemable no later than twelve (12) months and one (1) day from the date the subscription is accepted by the Company;

27

_____ Preferred Series A-IRO (interest roll-over) Units which will be redeemed by the Company for twenty thousand U.S. dollars (US$20,000) no later than twelve (12) months and one (1) day from the date the investor's subscription is accepted by the Company.  At the time of redemption, the Company shall distribute ten thousand U.S. dollars (US$10,000) to the investor and then shall roll over the return amount of ten thousand U.S. dollars (US$10,000) per Unit into the equivalent of either Preferred Series B Units or Preferred Series C Units, as the investor shall determine and advise the Company in writing no later than twenty (20) days prior to the redemption date;

_____ Preferred Series B Units, each of which consists of ten (10) of the Company's Preferred Units at a price of ten thousand U.S. dollars (US$10,000), redeemable for twenty thousand U.S. dollars (US$20,0000 no later than twenty-four (24) months from the date the subscription is accepted by the Company; plus semi-annual payments of interest calculated at eighteen percent (18%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company;

_____ Preferred Series C Units, each of which consists of ten (10) of the Company's Preferred Units at a price of ten thousand U.S. dollars (US$10,000), redeemable for twenty thousand U.S. dollars (US$20,000) no later than thirty-six (36) months from the date the subscription is accepted by the Company; plus quarterly payments of interest calculated at twenty-four percent (24%) per annum, commencing six (6) months from the date the investor's subscription is accepted by the Company.

1.2  The Investor: _____ shall deliver, or, _____ Has delivered, the sum of U.S. $_____ to the Issuer.

       WIRE INSTRUCTIONS:

| | |
|---|---|
| Bank: | Chase Bank N.A. |
| | 5305 Ehrlich Road |
| | Tampa, FL 33625 |
| SWIFT Code: | CHASUS33 |
| Routing No: | 267084131 |
| Account Name: | TRC Funding Group No. 1 LLC |
| | 1000 Corporate Drive, Suite 500 |
| | Fort Lauderdale, FL 33334 |
| Account No.: | 102975528 |

1.3 Subscriptions delivered to the Issuer are not subject to revocation by the Investor. The Investor acknowledges and agrees that this Agreement shall not be binding on the Issuer until this Agreement, along with all other requisite documents and funds, have been delivered to 1000 Corporate Drive, Suite 500, Fort Lauderdale, FL 33334 U.S.A. and the Issuer has accepted the Agreement upon satisfying itself that all applicable securities laws have been compiled with, and that, if applicable, the Investor is a sophisticated purchaser or accredited investor.

2. **REPRESENTATION AND WARRANTIES**

2.1 The Investor represents and warrants to the Issuer that:

(a)  the Investor is purchasing the Units/Shares as principal and not on behalf of any third party;

(b)  the Investor knows that the Units/Shares are being acquired pursuant to exemptions under the United States Securities Act of 1933, as amended (the "Securities Act");

(c)  the Investor is not a "U.S. Person" as defined in Regulation S of the Securities Act and is not acquiring the Units/Shares for the account or benefit of a U.S. Person;

(d)  the Investor is acquiring the Units/Shares in an "offshore transaction" as defined by Rule 902(h) of Regulation S; and

(e)  the Investor is not acquiring the Units/Shares as a result of any information about the affairs of the Issuer that is not generally known to the public other than knowledge of this particular transaction.

2.2 The Issuer represents and warrants to the Investor that:

(a)  the Issuer is a corporation duly incorporated and in good standing under the laws of the State of Florida; and

(b)  this Agreement has been duly authorized by the necessary corporate action on the part of the Issuer and it constitutes a valid obligation of the Issuer duly binding upon it and enforceable in accordance with its terms.

29

Case 0:19-cv-62481-PCH   Document 55   Entered on FLSD Docket 03/10/2020   Page 63 of 146

3.  **<u>COVENANTS</u>**

The Investor covenants with the Issuer to execute and deliver such further documents and do all such further acts and things as may be necessary to comply with the Commissions' requirements for this private placement and to carry out the intent of this Agreement.

4.  **<u>SECURITIES LAW MATTERS</u>**

4.1  The Investor is aware of an acknowledges to and agrees with the Issuer as follows:

    (a)  the Units/Shares have not been and will not be registered under the Securities Act in reliance on the exemptions under the Act;

    (b)  the holder thereof, by purchasing such securities agrees for the benefit of the Issuer that such Units/Shares may be offered, sold, pledged or otherwise transferred only (i) in accordance with the provisions of Regulation S and Rule 144 (if applicable) under the Securities Act, (ii) pursuant to registration under the Securities Act or (iii) pursuant to an available exemption from the registration requirements of the Securities Act;

    (c)  the holder will not engage in hedging transactions with regard to the Units/Shares unless in compliance with the Securities Act;

    (d)  any person to whom any of the Units/Shares, or any interest therein, are transferred will, in turn, be subject to applicable retransfer restrictions; the Investor fully comprehends that the Issuer is relying to a material degree on the representations, warranties and agreements contained herein and in his or her Investment Representation Letter and Investor Questionnaire submitted to the Company, and with such realization, authorizes the Issuer to act as it may see fit in full reliance hereon, including the placement on the certificates or other documents evidencing the Units/Shares of the following legend and any legends required by any applicable state securities laws:

THE UNITS/SHARES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED SECURITIES AS THAT TERMS IS DEFINED IN RULE 144 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND HAVE NOT BEEN REGISTERED UNDER THE ACT. THEY MAY NOT BE OFFERED FOR SALE, SOLD OR TRANSFERRED UNLESS SO REGISTERED, IN ACCORDANCE WITH REGULATION S AND RULE 144 UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. HEDGING TRANSACTIONS WITH REGARD TO THESE SHARES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. THE ISSUER MAY REQUIRE AN OPINION OF COUNSEL SKILLED IN SECURITIES MATTERS AND OTHER EVIDENCE OF COMPLIANCE WITH THE ACT PRIOR TO PERMITTING A TRANSFER OF THESE SHARES.

BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT IT IS NOT A U.S. PERSON AND IS ACQUIRING THE SECURITIES IN AN OFFSHORE TRANSACTION, (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THE SECURITIES EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT, (B) IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S AND RULE 144 (C) PURSUANT TO ANY OTHER EXEMPTION FROM REGISTRATION UNDER THE ACT (IF AVAILABLE), (3) AGREES IT WILL NOT CONDUCT ANY HEDGING TRANSACTIONS INVOLVING THE SECURITIES UNLESS IN COMPLIANCE WITH THE ACT, AND (4) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THE SECURITIES ARE TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE ACT.

The Investor fully comprehends that the Issuer is relying to a material degree on the representations, warranties and agreements contained herein and in his or her

(f) the Investor agrees that the Issuer may require than none of the Units/Shares or any interest therein may be sold, transferred or otherwise disposed of unless registered under the Securities Act, without his or her having first presented to the Issuer or its counsel a written opinion of counsel experienced in securities law matters indicating that the proposed disposition will not be in violation of any of the registration provisions of the Securities Act and the rules and regulations promulgated thereunder, and the Company will refuse to register any transfer of the Shares not made in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act or pursuant to an exemption from registration; and

(g) the Investor acknowledges that the foregoing is not a complete statement of the law applicable to resale of the Units/Shares, but merely an outline of some of the more salient features. For legal advice in these matters, the Investor will continue to rely on its own legal counsel as the Investor has throughout this transaction concerning the purchase of the Units/Shares.

## 5. <u>INDEMNIFICATION</u>

5.1 The Investor hereby indemnifies and holds harmless the Issuer and its officers, directors, shareholders, agents, employees, attorneys, successors, and assigns from and against all damages, losses, costs, liabilities, and expenses (including costs of investigation, defense, and attorneys' fees) incurred by reason of the failure of the Investor to fulfill any of the Investor's obligations hereunder or by reason of any breach or inaccuracy of any of the representations or warranties made by the Investor herein.

## 6. <u>GENERAL</u>

6.1 This Agreement is subject to the approval of such regulatory authorities that have jurisdiction over the Issuer, including all Commissions.

6.2 Neither the Investor nor the Issuer may assign all or any part of his, her or its interest in or to this Agreement without the written consent of the other and any purported assignment without such consent will be void.

6.3 This Agreement is to be governed and interpreted according to the laws of the State of Florida without regard to conflict of laws or principles.

6.4  This Agreement shall inure to the benefit of and be binding upon the parties and their successors, personal representatives and permitted assigns.

6.5  Time is of the essence of this Agreement.

6.6  The parties to this Agreement may amend this Agreement only in writing.

6.7  The parties to the Agreement will execute and deliver such investor questionnaires, documents, transfers, assurances, share certificates and procedures necessary for the purposes of giving effect to or perfecting the transactions contemplated by this Agreement.

6.8  All notice or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the address given above, and such notice will be deemed to be given on the date of receipt.

IN WITNESS WHEREOF the parties hereto have hereunder set their hands as of the date first state above.

**TRC FUNDING GROUP NO. 1 LLC**

BY:

_____

**, MANAGER**

**If Investor is an individual:**

_____          _____
Name of Investor                         Signature of Investor


_____          _____
Name of Witness                          Signature of Witness


_____
Address of Investor


_____
Occupation



**OR**


If Investor is a corporation, trust or other
entity:


_____
Name of Corporation

By: _____

Name:


_____
Title:

## <u>INVESTMENT REPRESENTATION LETTER (FOREIGN INVESTORS)</u>

**TRC FUNDING GROUP NO. 1 LLC**
**1000 CORPORATE DRIVE**
**SUITE 500**
**FORT LAUDERDALE, FL 33334 U.S.A.**

<u>Attention</u>: Mr. Sugimoto and Mr. Hammer

Gentlemen and Ladies:

The undersigned proposes to acquire "Units" issued by TRC Funding Group No. 1 LLC, a Florida limited liability company. The Unit price is U.S. $10,000.00. Each Preferred Unit consists of ten (10) shares of Series A, Series A-IRO, Series B or Series C Preferred Units.

The undersigned understands that the Units will be issued to the undersigned without registration under the Securities Act of 1933, as amended (the "Securities Act"), or qualification under any state securities laws.

As an inducement for the Company to complete the sale and issuance of the Units to the undersigned, the undersigned hereby agrees, represents and warrants to the Company as follows:

a.  The undersigned is not a "U.S. Person" and is not acquiring the Units for the account or benefit of a U.S. Person. "U.S. Person" is defined in Regulation S under the Securities Act;

b.  The undersigned is acquiring the Units in an "offshore transaction" as defined by Rule 902(h) of Regulation S under the Securities Act;

c.  The undersigned may resell any Shares acquired only in accordance with the provisions of Regulation S under the Securities Act, pursuant to registration under the Securities Act or pursuant to an available exemption from the registration requirements of the Securities Act;

d.  The undersigned will not engage in hedging transactions with regard to the Units unless in compliance with the Securities Act;

e.  The undersigned is an experienced investor, having had prior experience with investments in companies of similar risk to the Company;

f.  The undersigned, either alone or with his professional advisors, if any, has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the proposed purchase of the Units/Shares and the investment in the Company;

g.  The undersigned understands that the acquisition of the Preferred Units/Shares involves substantial risk and the undersigned has carefully analyzed and is aware of all of the risk factors related to the ownership of the Shares and has the ability to bear the economic risk of his proposed investment in the Company, and the undersigned can hold the Shares indefinitely and could afford a complete loss on the Shares;

h.  The undersigned has obtained and reviewed all information about the Company that he desires and which he feels is necessary to enable him to recognize and evaluate the merits and risks of his purchase of the Units and investment in the company and the undersigned has had a reasonable opportunity to ask questions of and receive answers from the Company's officers, or a person or persons acting on their behalf, concerning the Company and the Shares and all such questions have been answered to the undersigned's full satisfaction;

i.  The undersigned has relied on his own tax and legal advisor and his own investment counselor with respect to the income tax and investment considerations of ownership of the Units;

j.  Solicitation of an offer to acquire the Units was directly communicated to the undersigned and any Purchaser Representative(s) that the undersigned may have. At no time was the undersigned presented with or solicited by or through any leaflet, public promotional meeting, circular, newspaper or magazine article, radio or television advertisement or any other form of general advertising in connection with such communicated offer; and

k.  The Units and Warrants are being acquired and will be held by the undersigned for personal investment and the undersigned has no present intention of distributing any of the Units or any interest therein to others.

36

The undersigned acknowledges that the offer and sale of the Units has not been registered under the Securities Act, or qualified under the securities law of any state, and that the Units thus are not freely tradable. The undersigned further acknowledges and agrees as follows:

1. All of the information contained in the Investor Questionnaire being delivered by the undersigned to the Company simultaneously herewith is complete and correct; and the undersigned understands that in determining that exemptions from the registration and qualification provisions of the Securities Act and any applicable state securities laws, the Company is relying in part upon the presentations, warranties and agreements made by the undersigned herein and in the Investor Questionnaire referred to above; and

2. *The undersigned hereby indemnifies and agrees to hold the Company, and each of its officers, directors, employees and agents, harmless from and against any and all damages suffered and liabilities incurred (including costs of investigation, defense and attorneys' fees) by reason of or arising out of any inaccuracy in the agreements, representations, and warranties which the undersigned has made herein.*

The undersigned understands that the foregoing is not intended to be a complete statement of the law applicable to resale of the Shares, but merely an outline of some of the more salient features. For legal advice in these matters, the undersigned will rely on his or her own legal counsel concerning his purchase of the Units.

Dated:

Very truly yours,

If Investor is an individual:

_____                    _____
Signature                                            Name (please print)
If Investor is a corporation, trust or other entity:

_____
Name of Entity

_____

Address of Entity


By: _____

Name: 

Title: _____

**EXHIBIT C: PURCHASER QUESTIONNAIRE**

**TRC FUNDING GROUP NO. 1 LLC**

It is important for TRC Funding Group No. 1 LLC (the "Company") to determine potential purchasers' qualifications and suitability for investing in this type of offering. Each purchaser must be qualified, prior to making an offer to invest, as to his ability to evaluate the merits and risks of the investment and his capacity to bear the economic risk. Prior to investment, the Company must determine that the investor or his representative in fact is capable of evaluating the merits and risks of the prospective investment. The Company requires that this Questionnaire be completed by each potential purchaser prior to the time that a sale is made. All information will be kept confidential and will, unless compelled by subpoena or other proceedings, be disclosed only to the Company, its counsel, and other necessary persons.

1.  Name: _____ Age _____

2.  Residence Address: _____

    _____

3.  Business Address: _____

    _____

4.  Telephone No.:        _____

5.  Marital Status:        _____

6.  Social Security No.: _____

7.  Occupation:_____

8.  Employer & Position: _____

    How long there? _____

9.   Other business connections (service on Board of Directors, etc.)

    _____

    _____

    _____

    _____

    _____

10. Educational background (Specify name of college and degree obtained, if any)

    _____

    _____

11. Do you presently own securities or other types of investments? Yes___ No ___

    If yes, describe your principle investments (type, value, etc.)

_____

_____

_____

_____

12. What is your investment objective in investing in the Preferred Units of TRC Funding Group #1 LLC (the "Preferred Units") (i.e. income, appreciation, etc.)?

_____

_____

_____

_____

13. Have you ever invested in a private placement before? \_\_\_ Yes \_\_\_ No

If yes, describe these investments (identify type, date, location, objective, etc.)

_____

_____

_____

14. Do you understand the nature of the investment and feel that you have sufficient knowledge about the Company's proposed business to evaluate the risks associated with investment in the Company? \_\_\_\_ Yes \_\_\_\_ No

15. How did you first learn of the availability of investment in the Company?

_____

_____

_____

16. Have you been furnished a copy of the Memorandum dated January 1, 2017?

\_\_\_ Yes \_\_\_ No

17. Do you understand that the Preferred Units are to be purchased for your personal investment only, that the investment is illiquid, and that you will not be able to resell the Preferred Units which you purchase unless you do so in an exempt transaction or unless the Preferred Units are registered under the Federal Securities Act of 1933 and applicable state securities acts?

\_\_\_\_ Yes \_\_\_\_ No

If you are not purchasing the Preferred Units for yourself, for whom are you purchasing them? _____

18. During the following years, my household gross income was: <check one for each year>

40

| | 2014 | 2015 | 2016 | 2017 (Projected) |
|---|---|---|---|---|
| (in U.S. Dollars) | | | | |
| 0-$100,000 | ____ | _____ | _____ | _____ |
| $100,001-$200,000 | ____ | _____ | _____ | _____ |
| $200,001-$300,000 | ____ | _____ | _____ | _____ |
| Over $300,000 | ____ | _____ | _____ | _____ |

19. Current, my net worth (not including investment in the Company) is: <check one> (in U.S. Dollars)

       0-$500,000 _____

       $ 500,001 to 1,000,000 _____

       $1,000,001 to 1,500,000_____

       $1,500,001 to 2,000,000_____

       Over $2,000,000 _____

20. Do you understand that there is no guarantee of any financial return on this investment and that you run the risk of losing your entire investment?

       ____ Yes ____ No

21. Have you been afforded the opportunity to inspect the Company's legal documents and other records and to ask questions of a representative of the Company regarding this investment, the Company and the Company's proposed operations, and the Company's method of doing business?

       ___ Yes ____ No

If so, have you received satisfactory answers to your questions?

       ____ Yes ____ No

22. Are all of the answers which you have provided to the questions above true and correct to the best of your knowledge?

       ____ Yes ____ No

Date: _____

_____

Signature of Investor #1

_____

Printed Name of Investor

_____

Signature of Investor #2

_____

Printed Name of Investor

**EXHIBIT D: OPERATING AGREEMENT**

# OPERATING AGREEMENT
# OF
# TRC FUNDING GROUP NO. 1 LLC

This **OPERATING AGREEMENT** is entered into effective as of January 1, 2017, by and among the persons whose names are set forth on Exhibit "A" attached hereto, as the Members, and the Company.

## SECTION 1.  ORGANIZATION

1.1     *Formation*.  The Members hereby agree to form a limited liability company pursuant to the provisions of the Act, as defined in Section 2.2 hereof, and upon the terms and conditions set forth in this Agreement.

1.2     *Name*.  The name of the Company shall be **TRC FUNDING GROUP NO. 1 LLC**.  The name of the Company may be changed by the decision of a Majority in Interest of the Members.

1.3     *Purpose*.  The purpose of the Company is to engage in any business or activity lawful under the laws of the State of Florida or of any other jurisdiction in which the Company has registered to transact business.

1.4     *Title to Property*.  The title to all real and personal property owned by the Company shall be held in the name of the Company or in such other manner as the Managers may determine.

1.5     *Principal Place of Business; Registered Agent*.  The principal place of business of the Company shall be at **1000 Corporate Drive, Suite 500, Fort Lauderdale, Florida 33334**.  The Managers may change the principal place of business of the Company to any other place within the State of Florida upon ten (10) days notice to the Members. The initial registered agent and street address in the

State of Florida is and shall hereafter be that person designated as registered agent in the records of the Florida Department of State.

           1.6     **_Term_**. The term of the Company shall commence upon filing the articles of organization (the "Articles") in the office of the Florida Department of State, in accordance with the Act (the "Filing Date") and shall continue until the Company is terminated in accordance with the terms of Section 13 hereof.

           1.7     **_Filings_**.

        (a)     The Articles shall be filed in the office of the Florida Department of State in accordance with the provisions of the Act. The Managers shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of Florida.

        (b)     The Managers shall cause appropriate fictitious business name and like statements to be filed and published for the Company for such name or names as the Company may have or use in any state or jurisdiction from time to time.

        (c)     The Managers shall execute and cause to be filed such original or amended articles, and shall take any and all other action, as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar entity under the laws of any state or jurisdiction in which the Company engages in business.

        (d)     No Manager or Member shall file with the Florida Department of State any document not authorized pursuant hereto.

           1.8     **_Independent Activities_**. The Managers and each Member may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same are competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member. Neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member from engaging in such activities, or require any Member to permit the Company or any Member to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by any Member, each Member hereby waives, relinquishes and renounces any such right or claim of participation.

           1.9     **_Initial Managers_**. The initial Managers of the Company shall be **Ghen Sugimoto and David E. Hammer.**

1.10     ***Entity Classification***.  The Company shall elect to be classified as a partnership pursuant to Section 301.7701-3 of the Regulations (or, if the Company has only one (1) Person owning a Transferable Interest, to be classified as a disregarded entity).  The Company may elect to change its classification pursuant to such Regulations upon the affirmative vote of Members with the right to vote, holding more than seventy-five percent (75%) of the Transferable Interests then held by Members.


## SECTION 2.  DEFINITIONS


2.1     "Acquiring Purchaser" means any Member and/or the Company purchasing all or any portion of the Transferable Interest of another Member pursuant to Section 12 hereof.


2.2     "Act" means the Florida Limited Liability Company Act, as set forth in Chapter 605 of the Florida Statutes, as amended from time to time (or any corresponding provisions of succeeding law).


2.3     "Adjusted Capital Account Deficit" means, with respect to any Member or Transferee, the deficit balance, if any, in such Member's or Transferee's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:


(a)     Credit to such Capital Account:  (i) the amount of any unconditional obligation of such Member or Transferee imposed by this Agreement or by state or local law to make contributions to the Company; and (ii) any amounts which such Member or Transferee is obligated to restore or is deemed to be obligated to restore pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and


(b)     Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), (*d*)(*5*) and (*d*)(*6*) of the Regulations.


The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.


2.4     "Affiliate" means, with respect to any Manager or Member:  (i) any Person directly or indirectly controlling, controlled by or under common control with such Manager or Member; (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Manager or Member; (iii) any officer, director or general partner of such Manager or Member; or (iv) any

Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities of any Person described in clauses (i) through (iii) of this sentence.

2.5     "Agreement" or "Operating Agreement" means this Operating Agreement, as amended from time to time.  Words such as "herein," "hereinafter," "hereof," "hereto," and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

2.6     "Capital Account" means, with respect to any Member or Transferee, the Capital Account maintained for such Member or Transferee in accordance with the following provisions:

(a)     To each Member's or Transferee's Capital Account there shall be credited such Member's or Transferee's Capital Contributions, such Member's or Transferee's distributive share of Profits and items in the nature of income or gain which are specially allocated pursuant to Sections 4.3 or 4.4 hereof, and the amount of any Company liabilities assumed by such Member or Transferee or which are secured by any Company Property distributed to such Member or Transferee.

(b)     To each Member's or Transferee's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company Property distributed to such Member or Transferee pursuant to any provision of this Agreement, such Member's or Transferee's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 4.3 or 4.4 hereof, and the amount of any liabilities of such Member or Transferee assumed by the Company or which are secured by any property contributed by such Member or Transferee to the Company.

(c)     If any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(d)     In determining the amount of any liability for purposes of Sections 2.3(a), 2.3(b), 2.6(a), and 2.6(b) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.  If the Managers determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Managers may make such modification.  The Managers shall adjust the amounts debited or credited to Capital Accounts with respect to (i) any property contributed to the Company or distributed to the Members and Transferees, and (ii) any liabilities which are secured by such contributed or distributed property or which are assumed by the Company or the Members and Transferees, if the Managers determine such adjustments are necessary or appropriate

pursuant to Section 1.704-1(b)(2)(iv) of the Regulations.  The Managers also shall make any appropriate modifications if unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

2.7 "Capital Contribution" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Transferable Interest held by such Member in the Company, including a Member's initial Capital Contribution made pursuant to Section 3.2 hereof.  "Preferred Series A Contribution," "Preferred Series A-IRO Contribution," "Preferred Series B Contribution," "Preferred Series C Contribution," and "Preferred Series D Contribution," mean, respectively, the Capital Contributions made by any Member with respect to the Preferred Series A Units, Preferred Series A-IRO Units, Preferred Series B Units, Preferred Series C Units, or Preferred Series D Units, if any, held by such Member in the Company.

2.8 "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

2.8A "Common Units" has the meaning set forth in Section 2.34 hereof.

2.9 "Company" means the limited liability company formed pursuant to this Agreement and the entity continuing the business of the Company in the event of dissolution as hereinafter provided.

2.10 "Company Property" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

2.11 "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such fiscal year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such fiscal year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

2.12 "Direct or Indirect Interest" means any of the following:

(a) A Transferable Interest or any interest therein;

(b)      A beneficial interest in any trust that holds any Transferable Interest or any interest therein;

(c)      An interest in any partnership or limited liability company that holds any Transferable Interest or any interest therein;

(d)      Stock of any corporation that holds any Transferable Interest or any interest therein; or

(e)      A legal or beneficial interest in any Person that holds, directly or indirectly, any one or more of the interests described above in this Section 2.12.

2.13    "Family Member" means, with respect to any Member, such Member's brothers, sisters, ancestors, and lineal descendants.

2.14    "Filing Date" has the meaning set forth in Section 1.6 hereof.

2.15    "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)      The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset on the date of contribution, as determined by the contributing Member and the Company.

(b)      The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managers, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Members in exchange for more than a *de minimis* Capital Contribution; (ii) the distribution by the Company to a Member or Transferee of more than a *de minimis* amount of Company Property or money; and (iii) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(*g*) of the Regulations; provided, however, that adjustments pursuant to clauses (i) and (ii) shall be made only if the Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members and Transferees and the Company.

(c)      The Gross Asset Value of any Company asset distributed to any Member or Transferee shall be the gross fair market value of such asset on the date of distribution, as determined by the receiving Member or Transferee and the Company.

(d)     The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)($m$) of the Regulations, and Sections 2.29 (f) and 4.3(e) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 2.15(d) to the extent the Managers determine that an adjustment pursuant to Section 2.15(b) hereof is not necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 2.15(d).

If the Gross Asset Value of a Company asset has been determined or adjusted pursuant to Section 2.15(a), 2.15(b), or 2.15(d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

2.15A   "Gross Receipts" means the gross cash proceeds from Company operations, net of returns and allowances.

2.16     "Majority in Interest of the Members" means Members holding more than fifty percent (50%) of the Common Units then held by the Members.

2.17     "Manager" means any Person who (i) is referred to as such in Section 1.9 hereof or who is elected a Manager pursuant to the terms of this Agreement, and (ii) has not ceased to be a Manager pursuant to the terms of this Agreement

2.18     "Member" means any Person whose name is set forth on Exhibit "A" attached hereto or who has become a Member pursuant to the terms of this Agreement, and who has not ceased to be a Member pursuant to the terms of this Agreement.

2.19     "Net Cash From Operations" means Gross Receipts, less (i) the distributions made pursuant to Section 5.1 hereof, and (ii) the portion of Gross Receipts used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, future acquisitions and purchases, reinvestments and contingencies, all as determined by the Managers to be in furtherance of the business purpose of the Company.  "Net Cash from Operations" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances.

2.20     "Net Cash from Sales or Refinancing" means the net cash proceeds from all sales and other dispositions (other than in the ordinary course of business) and all refinancing of Company Property, less any portion thereof used to establish reserves, all as determined by the Managers to be in furtherance of the business purpose of the Company.  "Net Cash from Sales or Refinancing" shall include all principal and interest payments with respect to any note or other obligation received by the Company in

connection with sales and other dispositions (other than in the ordinary course of business) of Company Property.

2.21    "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

2.22    "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

2.23    "Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

2.24    "Partner Nonrecourse Debt Minimum Gain" means an amount with respect to each Partner Nonrecourse Debt equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

2.25    "Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i) of the Regulations.

2.26    "Partnership Minimum Gain" has the meaning set forth in Section 1.704-2 of the Regulations.

2.27    "Permitted Transfer" and "Permitted Transferee" have the meanings set forth in Section 11.2 hereof.

2.28    "Person" means any individual, partnership, limited liability company, corporation, estate, trust or other entity.

2.29    "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 2.29 shall be added to such taxable income or subtracted from such taxable loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(*i*) of the Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 2.29 shall be subtracted from such taxable income or added to such taxable loss;

(c)     If the Gross Asset Value of any Company asset is adjusted pursuant to Section 2.15(b) or 2.15(c) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with Section 2.11 hereof;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-1(b)(2)(iv)(*m*)(*4*) of the Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Transferable Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(g)     Notwithstanding any other provision of this Section 2.29, any items which are specially allocated pursuant to Section 4.3 or Section 4.4 hereof shall not be taken into account in computing Profits or Losses.

2.30     "Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

2.31A  "Preferred Series A Contribution," "Preferred Series A-IRO Contribution," "Preferred Series B Contribution," "Preferred Series C Contribution," and "Preferred Series D Contribution" have the meaning set forth in Section 2.7 hereof.

2.31B  "Preferred Series A Return," "Preferred Series A-IRO Return," "Preferred Series B Return," "Preferred Series C Return," and "Preferred Series D Return" have the meaning set forth in Section 3.2 hereof.

2.31C  "Preferred Series A Units," "Preferred Series A-IRO Units," "Preferred Series B Units," "Preferred Series C Units," and "Preferred Series D Units" have the meaning set forth in Section 2.34 hereof.

2.31    "Substituted Member" means any Person admitted to the Company as a Member pursuant to Section 11.6 hereof.

2.32    "Tax Matters Partner" has the meaning set forth in Section 6.17(m) hereof.

2.33    "Transfer" means, as a noun, any voluntary or involuntary transfer, sale, assignment, devise, gift, pledge, encumbrance, hypothecation, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, assign, devise, gift, pledge, encumber, hypothecate, or otherwise dispose of.

2.34    "Transferable Interest" means the right to receive distributions from the Company. Transferable Interests shall include common interests in the Company, which shall be referred to as "Common Units," as well as preferred interests, which shall be referred to as "Preferred Series A Units," "Preferred Series A-IRO Units," "Preferred Series B Units," "Preferred Series C Units," and "Preferred Series D Units."  No Transferable Interests shall be issued to any person who has not been admitted as a Member.  However, Transferable Interests may be transferred as set forth herein.  Members shall have voting rights only with respect to their Common Units.  Except as specifically set forth herein, Members shall not have voting rights with respect to any preferred interests-i.e. Preferred Series A Units, Preferred Series A-IRO Units, Preferred Series B Units, Preferred Series C Units or Preferred Series D Units.

2.35    "Transferee" means any Person, other than a Member, owning any Transferable Interest.  A Transferee shall have only the entitlement of a transferee as described in Section 605.0502 of the Florida Statutes or a successor statute thereto.  A Transferee shall be entitled to receive distributions and allocations with respect to such Transferable Interest as set forth in this Agreement but shall have no right to require any information or account of the Company, inspect the Company books or vote in any matter requiring a vote of the Members.

2.36   "Trust Beneficiary" means, with respect to any trust, each Person who is currently entitled to, or at the discretion of any Person may receive, a distribution from the principal or income of the trust (including any permissible appointee under a currently exercisable power of appointment).

2.37   "Units" have the meaning set forth in Section 2.34 hereof.

## SECTION 3.  MEMBERS; CAPITAL CONTRIBUTIONS

3.1   *Members*.

(a)   The names and addresses of the Members are set forth on Exhibit "A" attached hereto.

(b)   The Company shall initially issue to the Members set forth on Exhibit "A" attached hereto the number of Common Units, Preferred Series A Units, Preferred Series A-IRO Units, Preferred Series B Units, Preferred Series C Units or Preferred Series D Units set forth next to their names thereon.

3.2   *Capital Contributions*.

(a)   The Members agree to transfer to the Company upon the request of the Managers as their initial Capital Contribution, the amount of cash set forth opposite their names on Exhibit "A" attached hereto.  Each Member who will be issued Common Units shall receive one Common Unit for each dollar contributed.  Each Member who will be issued Preferred Series A Units, Preferred Series A-IRO Units, Preferred Series B Units, Preferred Series C Units and/or Preferred Series D Units shall receive ten (10) Preferred Units of the given Series for ten thousand U.S. dollars (US$10,000), each of which shall be redeemed for twenty thousand U.S. dollars (US$20,000) per the redemption and other applicable terms as set forth in Section 5 below.

3.3   *Amendments for Changes to Members and Interests*.  The Managers shall amend Exhibit "A" attached hereto from time to time to reflect the admission or dissociation of Members, the Transfer of Transferable Interests, and the shifting of relative Transferable Interests pursuant to the provisions of this Agreement; provided, however, if the Company issues certificates representing Transferable Interests in the Company, the Managers shall maintain a register or other means of reflecting the admission, dissociation and Transfers of Transferable Interests.

3.4     *__Miscellaneous__*.

(a)     Notwithstanding anything to the contrary in this Section 3, no Member shall be personally liable for the debts, liabilities, contracts or other obligations of the Company.  Except as set forth in Section 3.2 hereof, no Member shall be required to make any further Capital Contributions to the Company after such Member's Initial Contribution.  The Managers shall have no personal liability for the repayment of any Capital Contributions, Returns or Coupons to any Member.

(b)     Except as otherwise provided in this Agreement, no Member shall be entitled to the withdrawal or return of its Capital Contributions. Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

(c)     No Member shall receive any interest, salary or draw with respect to such Member's Capital Contributions or such Member's Capital Account.

(d)     Any Manager, Member or Affiliate of a Manager or Member may, with the consent of the Managers, lend or advance money to the Company.  If any such Person makes any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a contribution to the capital of the Company but shall be a debt due from the Company.  The amount of any such loan or advance by a lending Manager, Member or Affiliate of a Manager or Member shall be repayable out of the Company's cash and shall bear interest at a rate not in excess of the lesser of (i) the prime rate established, from time to time, by any major bank selected by the Managers for loans to such major bank's most credit worthy commercial borrowers, plus two percent (2%) per annum, or (ii) the maximum rate permitted by law.  None of the Managers, Members or their Affiliates shall be obligated to make any loan or advance to the Company.

## SECTION 4.  ALLOCATIONS

4.1     *__Profits__*.  After giving effect to the special allocations set forth in Sections 4.3 and 4.4 hereof, Profits for any fiscal year shall be allocated among the Members and Transferees as follows:

(a)     First, to the Members and Transferees receiving special allocations of Losses pursuant to Section 4.2(b) hereof, in proportion to such special allocations, and not to exceed the aggregate Losses allocated pursuant to Section 4.2(b) hereof.

(b)     Second, to the Members and Transferees in proportion to their Common Units.

4.2     *__Losses__*.

(a)     After giving effect to the special allocations set forth in Sections 4.3 and 4.4 hereof, Losses for any fiscal year shall be allocated among the Members and Transferees in proportion to their Common Units.

(b)     Losses allocated pursuant to Section 4.2(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Person to have an Adjusted Capital Account Deficit at the end of any fiscal year.  If some but not all of the Members or Transferees would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses, the limitation set forth in this Section 4.2(b) shall be applied on a Person by Person basis so as to allocate the maximum permissible Losses to each Person under Section 1.704-1(b)(2)(ii)(*d*) of the Regulations.  All Losses in excess of the limitations set forth in this Section 4.2(b) shall be allocated among the Members and Transferees in accordance with Section 4.2(a) hereof.

4.3     *__Special Allocations__*.

(a)     Notwithstanding any other provision of this Section 4 and except as provided in Section 1.704-2(f) of the Regulations, if there is a net decrease in Partnership Minimum Gain during any fiscal year, the Members and Transferees shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Members' and Transferees' shares of the net decrease in the Partnership Minimum Gain for the year, as determined in accordance with Section 1.704-2(g)(2) of the Regulations, that is allocable to the disposition of Company Property subject to one or more Nonrecourse Liabilities of the Company.  This Section is intended to comply with the minimum gain chargeback requirement of such Section of the Regulations and shall be interpreted consistently therewith.

(b)     Notwithstanding any other provision of this Section 4 and except as otherwise provided in Section 1.704-2(i)(4) of the Regulations and Section 4.3(a) hereof, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during any fiscal year, each Member or Transferee who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(3) of the Regulations, shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's or Transferee's share of the net decrease in Partner Nonrecourse Debt Minimum Gain subject to the limitations provided for in Section 1.704-2(i)(4) of the Regulations.  This Section is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)     If any Member or Transferee unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*d*)(*5*) or (*d*)(*6*) of the Regulations, items of Company income and gain shall be specially allocated to each such Member or Transferee in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital

Account Deficit of such Member or Transferee as quickly as possible, and provided that an allocation pursuant to this Section shall be made only if and to the extent that such Member or Transferee would have an Adjusted Capital Account Deficit after all allocations provided for in this Section had been tentatively made as if this Section were not in this Agreement.

(d)     If any Member or Transferee has an Adjusted Capital Account Deficit at the end of any fiscal year which is in excess of the sum of (i) the amount such Member or Transferee is obligated to restore pursuant to this Agreement, and (ii) the amount such Member or Transferee is deemed to be obligated to restore pursuant to Section 1.704-2 of the Regulations, each such Member or Transferee shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.3(d) shall be made only if and to the extent that such Member or Transferee would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Section had been made as if Section 4.3(c) hereof and this Section 4.3(d) were not in this Agreement.

(e)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)($m$) of the regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members and Transferees in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Section 1.704-1(b)(2)(iv)($m$) of the Regulations.

(f)     In order to identify the Members and Transferees who are to be allocated the Company's Nonrecourse Deductions, the Company's Nonrecourse Deductions shall be separately allocated to and among the Members and Transferees in proportion to their respective Transferable Interests (whether or not the Company has net losses for the fiscal year).  Notwithstanding the foregoing provisions, the separate allocation of Nonrecourse Deductions to the Members and Transferees shall be limited to an amount equal to the sum of:  (i) the amount of Losses to which such Members and Transferees would be entitled under Section 4.2 hereof if the separate allocations under this Section had not been made, and (ii) the amount of distributions of Net Cash from Operations, Net Cash from Sales or Refinancing, or distributions in liquidation of the Company made to such Members and Transferees during the fiscal year.  Likewise, allocations of Profits set forth in Section 4.1 hereof shall be modified, where appropriate.

(g)     Any Partner Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member or Transferee who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Regulations.

4.4     ***Curative Allocations***.   The allocations set forth in Sections 4.2(b) and 4.3(a) through (g) hereof (the "Regulatory Allocations"), are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Regulations.  The Regulatory Allocations may not be consistent with the manner in which the Members and Transferees intend to divide Company distributions.

Accordingly, the Managers are hereby authorized to divide other allocations of Profits, Losses, and other items among the Members and Transferees so as to prevent the Regulatory Allocations from distorting the manner in which Company distributions will be divided among the Members and Transferees.  In general, the Members anticipate that this will be accomplished by specially allocating other Profits, Losses, and items of income, gain, loss, and deduction among the Members and Transferees so that the net amount of the Regulatory Allocations and such special allocations to each such Member or Transferee is zero.  The Managers shall have discretion to accomplish this result in any reasonable manner.  Notwithstanding the foregoing, Regulatory Allocations relating to Nonrecourse Debt shall not be taken into account except to the extent that there has been a reduction in Partnership Minimum Gain or a reduction in Partner Nonrecourse Minimum Gain attributable to Partner Nonrecourse Debt.

4.5     ***Other Allocations Rules***.

(a)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managers using any permissible method under Code Section 706 and the Regulations thereunder.

(b)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members and Transferees in the same proportions as they share Profits or Losses, as the case may be, for the fiscal year.

(c)     The Members are aware of the income tax consequences of the allocations made by this Section 4 and hereby agree to be bound by the provisions of this Section 4 in reporting their shares of Company Profits and Losses for income tax purposes.

4.6     ***Tax Allocations***.

(a)     In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deductions with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members and Transferees so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with Section 2.15(a) hereof), in such manner as the Managers determine.

(b)     If the Gross Asset Value of any Company asset is adjusted pursuant to Section 2.15(b) hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax

purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

        (c)      Any elections or other decisions relating to such allocations shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's or Transferee's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

        (d)      The Preferred Series A Return, Preferred Series B Return, Preferred Series C Return, and Preferred Series D Return, shall each be reported as a guaranteed payment under Code Section 707(c), such that they shall be deductible to the Company and includible in the income of the recipient.

## SECTION 5.  DISTRIBUTIONS

        5.1    ***Gross Receipts from Operations***. The Managers shall distribute the portion of Gross Receipts set forth below, except to the extent prohibited under the Act.  Gross Receipts from Operations shall be distributed in the following order of priority:

        The first distribution priority shall be payments of Preferred Series A Coupon, Preferred Series A-IRO Coupon, Preferred Series B Coupon, Preferred Series C Coupon and Preferred Series D Coupon, if any, on a pari passu basis when due and payable as described below.

        The second distribution priority shall be payments of Preferred Series A Return, Preferred Series A-IRO Return, Preferred Series B Return, Preferred Series C Return and Preferred Series D Return, if any, on a pari passu basis when due and payable as described below.

        The third distribution priority shall be payments of the Preferred Series A Contribution, Preferred Series A-IRO Contribution, Preferred Series B Contribution, Preferred Series C Contribution and Preferred Series D Contribution, if any, on a pari passu basis when due and payable as described below.

        (a)      **Preferred Series A Return.**  A one-time annual distribution to the holders of Preferred Series A Units.  Such distributions shall be made no later than the twentieth (20th) day of the month following the one year anniversary of each Member's purchase of Preferred Series A Units and/or Preferred Series A-IRO Units.  Payments pursuant to this Section 5.1(a) shall be applied in proportion to their respective accrued and unpaid Series A Return or Series A-IRO Return of one hundred percent (100%)("Preferred Series A and A-IRO Return").

(b)      **Preferred Series A Contribution.**  A one-time annual distribution to the holders of Preferred Series A Units equal to the amount each Member contributed to purchase its Preferred Series A Units, if any.  Such distributions shall be made no later than the twentieth (20th) day of the month following the **one year anniversary** of each Member's purchase of Preferred Series A Units.  Payments pursuant to this Section 5.1(b) shall be applied in proportion to their respective unreturned Preferred Series A Contributions, until the unreturned Preferred Series A Contributions are reduced to zero.

(c)      **Preferred Series B Return.**  Commencing six months from the Company's acceptance of each Member's subscriptions for Preferred Series B Units, a semi-annual payment to the holders of Preferred Series B Units in an amount equal to nine percent (9%) coupon of the Members' Preferred Series B Contribution ("Preferred Series B Coupon").  Such distributions shall be made no later than the twentieth (20th) day of the month following each six month anniversary date of each Member's Preferred Series B Contribution.  Payments pursuant to this Section 5.1(c) shall be applied in proportion to their respective accrued and unpaid Preferred Series B Return of one hundred percent (100%)("Preferred Series B Return").

(d)      **Preferred Series B Contribution.**  A one-time distribution to the holders of Preferred Series B Units equal to the amount each Member contributed to purchase its Preferred Series B Units, if any.  Such distributions shall be made no later than the twentieth (20th) day of the month following the **second year anniversary** of each Members' purchase of Preferred Series B Units. Payments pursuant to this Section 5.1(d) shall be applied in proportion to their respective unreturned Preferred Series B Contributions, until the unreturned Preferred Series B Contributions are reduced to zero.

(e)      **Preferred Series C Return.**  Commencing six months from the Company's acceptance of a Members' subscriptions for Preferred Series C Units, a quarterly payment to the holders of Preferred Series C Units in an amount equal to six percent (6%) of the Members' Preferred C Contribution ("Preferred Series C Coupon"). The initial distribution shall be equal to two quarterly payments.  Such distributions shall be made no later than the twentieth (20th) day of the month following the initial six month anniversary and then each three month anniversary date thereafter from each Member's Preferred Series C Contribution.  Payments pursuant to this Section 5.1(e) shall be applied in proportion to their respective accrued and unpaid Preferred Series C Return of one hundred percent (100%)("Preferred Series C Return").

(f)      **Preferred Series C Contribution.**  A one-time distribution to the holders of Preferred Series C Units equal to the amount each Member contributed to purchase its Preferred Series C Units, if any.  Such distributions shall be made no later than the twentieth (20th) day of the monthly following the **third year anniversary** from each Member's purchase of Preferred Series C Units. Payments pursuant to this Section 5.1(f) shall be applied in proportion to their respective unreturned Preferred Series C Contributions, until the unreturned Preferred Series C Contributions is reduced to zero.

5.2 _**Net Cash from Operations**_.  Net Cash from Operations shall be distributed, at such times as the Managers may determine, in the following order of priority:

(a) First, consistent with the provisions of Section 5.1 hereof, until the unreturned Series A Contributions, unreturned Series A-IRO Contributions, unreturned Series B Contributions, unreturned Series C Contributions and unreturned Series D Contributions, if any, are redeemed each calendar year as required.

(b) Second, to the holders of Common Units, in proportion to their respective Common Units.

5.3 _**Net Cash from Sales or Refinancing**_.  Net Cash from Sales or Refinancing shall be distributed, at such times as the Managers may determine, in the following order of priority:

(a) First, consistent with the provisions of Section 5.1 hereof, until the unreturned Series A Contributions, Series A-IRO Contributions, unreturned Series B Contributions, unreturned Series C Contributions and unreturned Series D Contributions are reduced to zero.

(b) Second, to the holders of Common Units, in proportion to their respective Common Units.

5.4 _**Amounts Withheld**_.  All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to the Company or the Members and Transferees shall be treated as amounts distributed to the Members and Transferees pursuant to this Section 5 for all purposes under this Agreement.  The Managers may allocate any such amounts among the Members and Transferees in any manner that is in accordance with applicable law.

## SECTION 6.  MANAGERS

6.1 _**Function**_.  All Company powers shall be exercised by or under the authority of, and the business affairs of the Company shall be managed under the direction of, the Managers.

6.2 _**Qualification**_.  Managers need not be residents of the State of Florida or Members of the Company.  No person shall serve as Manager until such person has signed a Joinder to this Agreement in the form set forth in Exhibit "C" attached hereto;

6.3     **_Compensation to Managers_**.    Each Manager shall receive such annual compensation as determined from time to time by a Majority in Interest of the Members.  Initially, each Manager shall receive an annual base compensation of thirty thousand U.S. dollars (US$30,000) plus ten percent (10%) of the Company's annual earnings which shall be accrued and only paid by the Company after payment has been made as required in a given calendar year for all Coupons, Returns and Contributions for each of the Preferred Series A, Preferred Series A-IRO, Preferred Series B, Preferred Series C and Preferred Series D (See Section 5 above).

6.4     **_Payment of Expenses_**.  The Company shall pay its expenses either directly or by way of reimbursements.  If Company expenses are not billed directly to or paid by the Company, the Company shall reimburse the Managers or their Affiliates that paid for such expenses on the Company's behalf, including, but not limited to:  (i) organization expenses, including legal and accounting fees; (ii) the actual cost to the Managers of goods, services and materials used for or by the Company; and (iii) all other direct expenses actually incurred by the Managers or their Affiliates for or on behalf of the Company.

6.5     **_Duties of Managers_**.  A Manager shall perform the Manager's duties, including duties as a member of any committee of Managers upon which the Manager may serve, in good faith, in a manner the Manager reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  The Manager shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

(a)     one or more officers or employees of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented,

(b)     counsel, public accountants, or other persons as to matters the Manager reasonably believes to be within such person's professional or expert competence, or

(c)     a committee of Managers upon which the Manager does not serve, duly designated in accordance with Section 6.13 hereof, as to matters within its designated authority, which committee the Manager reasonably believes to merit confidence.

A Manager shall not be considered to be acting in good faith if the Manager has knowledge concerning the matter in question that would cause such reliance described above to be unwarranted.

A person who performs the Manager's duties in compliance with this Section 6.5 shall have no liability by reason of being or having been a Manager of the Company.

6.6     ***Presumption of Assent***.  A Manager of the Company who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Manager votes against such action or abstains from voting in respect thereto because of an asserted conflict of interest.

6.7     ***Number of Managers***.  The Company shall have one or more Managers, the exact number to be determined by the Members.  The number of Managers may be increased or decreased from time to time upon the affirmative vote of Members holding more than seventy-five percent (75%) of the Transferable Interests then held by Members permitted to vote, but no decrease shall have the effect of shortening the term of any incumbent Manager.  In the absence of action establishing or changing the number of Managers, the number of Managers shall be the number constituting the initial Managers pursuant to Section 1.9 hereof.

6.8     ***Election and Term***.  At the first meeting of Members and at each meeting held thereafter for such purpose, a Majority in Interest of the Members permitted to vote shall elect the Managers. Each Manager (including the person named in Section 1.9 hereof) shall hold office until a successor has been duly elected and qualified or until the Manager's earlier resignation, removal from office, or death.

6.9     ***Vacancies***.  Any vacancy occurring in the Managers, including any vacancy created by reason of an increase in the number of Managers, may be filled by the affirmative vote of a majority of the remaining Managers though less than a quorum of the Managers.  A Manager elected to fill a vacancy shall hold office only until the next election of Managers by the Members.

6.10    ***Removal of Managers***.  At a meeting of Members called expressly for that purpose, any Manager or every Manager may be removed, with or without cause, by a vote of a Majority in Interest of the Members permitted to vote.

6.11    ***Quorum and Voting***.  A majority of the number of Managers fixed pursuant to this Agreement shall constitute a quorum for the transaction of business.  The act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers.

6.12    ***Conflicts of Interest***.  No contract or other transaction between the Company and one or more of its Managers or any other corporation, firm, association, or entity in which one or more of the Managers are directors, managers, or officers or are financially interested, shall be either void or voidable because of such relationship or interest, or because such interested Managers are present at the meeting of the Managers or a committee thereof which authorizes, approves, or ratifies such transaction, or because such interested Managers' votes are counted for such purpose, if:

(a)    The fact of such relationship or interest is disclosed or known to the Managers or committee which authorizes, approves, or ratifies the transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested Managers; or

(b)    The fact of such relationship or interest is disclosed or known to the Members entitled to vote and they authorize, approve, or ratify such transaction by vote or written consent; or

(c)    The transaction is fair and reasonable as to the Company at the time it is authorized by the Managers, a committee, or the Members.

Common or interested Managers may be counted in determining the committee thereof which authorizes, approves, or ratifies such contract or transaction.

6.13    ***Executive and Other Committees***.  The Managers, by resolution adopted by a Majority of the number of Managers fixed pursuant to this Agreement, may designate from among the Managers an executive committee and one or more other committees each of which, to the extent provided in such resolution shall have and may exercise all the authority of the Managers, except that no committee shall have the authority to:

(a)    approve or recommend to Members actions or proposals required by law to be approved by Members,

(b)    designate candidates for the office of Managers, for purposes of proxy solicitation or otherwise,

(c)    fill vacancies for the office of Managers or any committee thereof, or

(d)    amend this Agreement.

The Managers, by resolution adopted in accordance with this section, may designate one or more Managers as alternate members of any such committee, who may act in the place and stead of any absent member or members at any meeting of such committee.

6.14    ***Place of Meetings***.  Meetings by the Managers may be held within or without the State of Florida.

6.15    *__Time, Notice, and Call of Meetings__*.

(a)    Written notice of the time and place of meetings of the Managers shall be given to each Manager at least three days before the meeting.

(b)    Notice of the meeting of the Managers need not be given to any Manager who signs a waiver of notice either before or after the meeting.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting and waiver of any and all obligations to the place of the meeting, the time of the meeting, or the manner in which it has been called or convened, except when a Manager states at the beginning of the meeting any objection to the transaction of business because the meeting is not lawfully called or convened.

(c)    Neither the business to be transacted at, nor the purpose of, any meeting of the Managers need be specified in the notice of such meeting.

(d)    A majority of the Managers present, whether or not a quorum exists, may adjourn any meeting of the Managers to another time and place.  Notice of any such adjourned meeting shall be given to the Managers who were not present at the time of the adjournment and, unless the time and place of the adjourned meeting are announced at the time of the adjournment, to the other Managers.

(e)    Meetings of the Managers may be called by the President of the Company (if any), or by any two Managers.

(f)    The Managers may participate in a meeting of the Managers by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time.  Participation by such means shall constitute presence in person at the meeting.

6.16    *__Action Without a Meeting__*.  Any action required to be taken at a meeting of the Managers, or any action which may be taken at a meeting of the Managers or a committee thereof, may be taken without a meeting if a consent in writing, setting forth the action so to be taken, signed by all of the Managers, or all the members of the committee, as the case may be, is filed in the minutes of the proceedings of the Managers or of the committees.  Such consent shall have the same effect as a unanimous vote.

6.17    *__Authority of the Managers__*.  Except to the extent otherwise provided herein, the Managers shall have the sole and exclusive right to manage the business of the Company and shall have all of the rights and powers which may be possessed by managers under the Act including, without limitation, the right and power to:

       (a)     acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

       (b)     Transfer Company Property;

       (c)     operate, maintain, finance, improve, construct, own, grant options with respect to, Transfer, mortgage and lease any real estate or any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Company;

       (d)     execute any and all instruments, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance and operation of Company Property;

       (e)     borrow money and issue evidence of indebtedness necessary, convenient or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge or other lien on any Company Property, as are necessary to consummate the purchase or refinancing of any Company Property;

       (f)     retain any security or other property originally contributed to the Company and to exchange such security or other property for other securities or property, and to retain such items received in exchange thereof;

       (g)     execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract or other instrument purporting to convey or encumber any or all of the Company Property;

       (h)     prepay in whole or in part, refinance, recast, increase, modify or extend any liabilities affecting the Company Property and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Company Property;

       (i)     care for and distribute funds to the Members by way of cash, income, return of capital or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company pursuant to this Agreement;

       (j)     contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(k)     engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company Property and Manager liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(l)     invest and reinvest in such securities and properties, real or personal, as may be determined to be in the best interests of the Company, including stocks, derivatives, common trust funds (including common trust funds maintained by a corporate trustee), secured or unsecured obligations, mutual funds, leases, undivided interests, bank accounts, money market funds, and stock brokerage accounts;

(m)     make any and all elections for federal, state and local tax purposes including, without limitation, any election, if permitted by applicable law:  (i) to adjust the basis of Company Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state or local law, in connection with transfers of Transferable Interests and Company distributions; (ii) to extend the statute of limitations for assessment of tax deficiencies against Members with respect to adjustments to the Company's federal, state or local tax returns; (iii) to elect to have Subchapter C of Chapter 63 of the Code apply pursuant to Code Section 6231(a)(1)(B)(ii); (iv) to enter into a settlement agreement pursuant to Code Section 6224(b)(c); and (v) to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and the Members in their capacity as Members; and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.  The Managers shall appoint a Member to act as the "Tax Matters Partner" under the Code and in any similar capacity under state or local law.  The Tax Matters Partner shall be required to obtain the consent of a Majority in Interest of the Members before entering into a settlement agreement, litigation or extension of the statute of limitations, with respect to any tax matter.  The initial Tax Matters Partner shall be **David E. Hammer**._____.

6.18    ***Right to Rely on Managers***.  Any Person dealing with the Company may rely upon a certificate signed by any Manager as to:

(a)     the identity of any Manager or Member;

(b)     the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by a Manager or which are in any other manner germane to the affairs of the Company;

(c)     the Persons who are authorized to execute and deliver any instrument or document of the Company; or

(d)    any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

6.19    ***Actions Requiring Consent of Majority in Interest of Members***.   Without the consent of a Majority in Interest of the Members, the Managers shall not have the authority to:

(a)    sell substantially all of the Company Property;

(b)    terminate the business of the Company;

(c)    change or reorganize the Company into any other legal form; or

(d)    admit additional Members, except as provided in this Agreement.

6.20    ***Actions Requiring Unanimous Consent of Members***.   Without the unanimous consent of the Members, the Managers shall not have the authority to:

(a)    do any act in contravention of this Agreement;

(b)    do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;

(c)    possess Company Property, or assign rights in specific Company Property, for other than a Company purpose; or

(d)    knowingly perform any act that would subject any Member to liability as a manager in any jurisdiction.

6.21     ***Obligations of Managers***.

(a)      The Managers shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Florida (and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged) and (ii) for the acquisition, development, maintenance, preservation and operation of Company Property in accordance with the provisions of this Agreement and applicable laws and regulations.

(b)      The Managers shall have the fiduciary duty for the safekeeping and use of all Company Property, whether or not in the immediate possession or control of the Managers, and shall not employ or permit another to employ Company Property in any manner except for the exclusive benefit of the Company.

(c)      The Managers shall devote to the Company such time as may be necessary for the proper performance of all duties hereunder, but the Managers shall not be required to devote full time to the performance of such duties.

(d)      The Managers shall take all actions which may be necessary or appropriate to prevent the Company from being treated as a publicly traded partnership within the meaning of Code Section 7704, except as otherwise prohibited pursuant to this Agreement.

6.22     ***Liability and Indemnification of Managers***.

(a)      The Managers and their Affiliates shall have no liability to the Company or any Member for any loss suffered by the Company which arises out of any action or inaction of the Managers or their Affiliates that the Managers or their Affiliates, in good faith, determined that such course of conduct was in the best interest of the Company and such course of conduct did not constitute grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of the law.  The Company shall indemnify the Members, Managers and their Affiliates against all losses, judgments, liabilities and expenses, including legal expenses and other costs as a result of any legal action, including the costs of appeal, (and amounts paid in settlement of any claims sustained by them in connection with the Company, to the fullest extent permitted under the Act.  Notwithstanding the foregoing, nothing contained herein shall release or relieve the Managers or their Affiliates from their fiduciary duty to the Company and the Members pursuant to the Act and other applicable laws.

(b)      The Company shall advance reasonable expenses, including attorneys fees and costs, incurred by a Person in connection with a claim or demand against the Person by reason of the Person's former or present capacity as a Member, Manager or Affiliate of a Manager, if the Person promises

to repay the Company in the event that the Person ultimately is determined not to be entitled to be indemnified under Section 6.22(a) hereof.

    (c)  The Company shall indemnify, save harmless and pay all expenses, costs or liabilities of any Manager who for the benefit of the Company makes any deposit, acquires any option or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and who suffers any financial loss as the result of such action.

    (d)  The Company may purchase and maintain insurance on behalf of any Person against liability asserted against the Person by reason of the Person's former or present capacity as a Member, Manager or Affiliate of a Manager, even if the Act would not permit the limitation or elimination of the Person's liability to the Company for the conduct giving rise to the liability, and even if the Act would not permit indemnification for the conduct giving rise to the liability.

    6.23  ***Agreement with Third Parties and with Affiliates of the Managers***.  The Managers may utilize the services of Affiliates to perform services for the Company, including, but not limited to, the following services: development, construction, leasing, management, insurance, financing, record keeping, data processing and other administrative activities.  The validity of any transaction, agreement or payment involving the Company or any Affiliate of any Manager otherwise permitted by the terms of this Agreement, shall not be affected by reason of the relationship between the Manager and such Affiliate.

## SECTION 7.  OFFICERS

    7.1  ***Officers***.  The Company shall have such officers as shall be elected from time to time by the Managers, each of whom shall serve until a successor is duly elected and qualifies.  Such officers may include, but are not limited to, a President, Secretary, Treasurer, one or more Vice Presidents, assistant officers and agents as may be deemed necessary and elected or appointed by the Managers from time to time.  Any two or more offices may be held by the same person.  The failure to elect a President, Secretary, Treasurer or other officer shall not affect the existence of the Company.

    7.2  ***Duties***.  The officers of the Company shall have the following duties:

    (a)  The President shall be the chief executive officer of the Company, shall have general and active management of the business and affairs of the Company subject to the directions of the Managers, and shall preside at all meetings of the Members and Managers.

(b)      Each Vice President shall possess, and may exercise, such power and authority, and shall perform such duties, as may from time to time be assigned to such Vice President by the Managers.

(c)      The Secretary shall have custody of, and maintain, all of the Company records except the financial records, shall record the minutes of all meetings of the Members and Managers, send all notice of meetings out, and perform such other duties as may be prescribed by the Managers or the President.

(d)      The Treasurer shall have custody of all Company funds and financial records, shall keep full and accurate accounts of receipts and disbursements and render accounts thereof whenever required by the Managers or the President, and shall perform such other duties as may be prescribed by the Managers or the President.

(e)      Each other officer, assistant officer and agent of the Company shall possess, and may exercise, such power and authority, and shall perform such duties, as may from time to time be assigned to such officer, assistant officer or agent by the Managers.

7.3      **_Removal of Officers_**.  Any officer or agent elected or appointed by the Managers may be removed by the Managers at any time when in its judgment the best interests of the Company will be served thereby.  Any officer or agent elected by the Members may be removed only by vote of the Members, unless the Members shall have authorized the Managers to remove such officer or agent.  Any vacancy, however occurring, in any office may be filled by the Managers.  Removal of any officer shall be without prejudice to the contract rights, if any, of the person so removed; however, election or appointment of an officer or agent shall not in itself create contract rights.

## SECTION 8.  MEMBERS

8.1      **_Rights or Powers_**.  Except as otherwise set forth in Section 8.2 hereof, the Members shall have no rights or powers to take part in the management and control of the Company and its business and affairs, or to act for or bind the Company in any way.

8.2      **_Voting Rights_**.  The Members who own Common Units shall have the right to vote on the matters explicitly set forth in this Agreement. Members who own only Preferred Series A Units, Preferred A-IRO Units, Preferred Series B Units, Preferred Series C Units and/or Preferred Series D Units shall have no right to vote. The Members with voting rights may elect by a unanimous vote of the Members to have the affairs of the Company be managed by the Members.

8.3     ***Time of Meetings***.  Meetings of the Members shall be held at the following times:

(a)     When designated by the President or the Managers as required for the operation of the Company.

(b)     When requested in writing by a Majority in Interest of the Members; provided that if more than thirteen (13) months have passed since the last preceding meeting of Members, then a special meeting of the Members shall be held when requested in writing by any Manager or by Members holding more than twenty-five percent (25%) of the Transferable Interests then held by Members.

8.4     ***Place of Meeting***.  Meetings of Members may be held within or without the State of Florida, at the place designated by the President or Managers or, in the event of disagreement or if no designation is made, at the principal place of business of the Company.

8.5     ***Notice of Meetings***.  Written notice stating the place, day, and hour of the meeting shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting, by or at the direction of the President or Secretary (if any), or the persons calling the meeting, to each Member entitled to vote at such meeting.

8.6     ***Waiver of Notice***.  When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

8.7     ***Quorum and Voting***.  A Majority in Interest of the Members with voting rights shall constitute a quorum at a meeting of Members.  If a quorum is present, the affirmative vote of Members holding a majority of the Transferable Interests represented by Members at the meeting and entitled to vote on the subject matter shall be the act of the Members, except as provided in this Agreement or the Act to the contrary.  After a quorum has been established, the subsequent withdrawal of Members, so as to reduce the number of Members entitled to vote at the meeting below the number required for a quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof.

8.8     ***Action by Members Without a Meeting***.  Any action required by the Act or this Agreement to be taken at any meeting of Members, or any action which may be taken at any meeting of such Members, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by the Members entitled to vote having not less than the minimum Transferable Interests that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted.  Within ten (10) days after obtaining such authorization by written consent, notice shall be given to those Members entitled to vote who have not consented in writing.

## SECTION 9.  BOOKS AND RECORDS

9.1     **_Books and Records_**.  The Company shall keep adequate books and records at its place of business, setting forth a true and accurate account of all business transactions arising out of and in connection with the conduct of the Company.  The Member or the Member's designated representative shall have the right, at any reasonable time, to have access to and inspect and copy, at the Member's expense, the contents of such books or records.

9.2     **_Annual Reports_**.  Within a reasonable period after the end of each Company fiscal year, each Member shall be furnished with pertinent information regarding the Company and its activities during such period.

9.3     **_Tax Information_**.  Necessary tax information shall be delivered to each Member after the end of each fiscal year of the Company.  Every effort shall be made to furnish such information within seventy-five (75) days after the end of each fiscal year of the Company.

## SECTION 10.  AMENDMENTS

10.1     **_Amendment by Members_**.  This Agreement shall not be amended unless in writing and approved by all of the Members.

10.2     **_Amendment by Managers_**.  Notwithstanding Section 10.1 hereof this Agreement may be amended by the Managers, without the consent of any of the Members to cure any ambiguity, to correct or supplement any provision hereof which may be inconsistent with any other provisions hereof, or to make any other provision with respect to matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; provided that no amendment shall be adopted pursuant to this Section 10.2 unless the adoption thereof is for the benefit of or not adverse to the interests of the Members.

## SECTION 11.  TRANSFER OF TRANSFERABLE INTERESTS

11.1     ***In General***.  Except as otherwise set forth in this Agreement, no Person may Transfer all or any portion of such Person's Direct or Indirect Interest.  Any Transfer by any Person which is not a Permitted Transfer shall be void and shall not cause or constitute a dissolution of the Company.  In addition, no Member may voluntarily or involuntarily dissociate as a Member from the Company before the Company dissolves and liquidates.  Any Person who has dissociated as a Member in violation of this Agreement shall be liable to the Company and the remaining Members for any damages incurred in connection therewith.  The dissociation of a Member shall have the effect set forth in Section 605.0603 of the Florida Statutes.

11.2     ***Permitted Transfers***.  Subject to the conditions and restrictions set forth in Section 11.3 hereof, any Person may Transfer any part or all of such Person's Direct or Indirect Interest to the following Persons (any such Transfer referred to herein as a "Permitted Transfer" and any such Person to whom a Permitted Transfer is made referred to herein as a "Permitted Transferee"):

(a)     the Company;

(b)     any other Member;

(c)     a Family Member of such Person;

(d)     a trust of which such Person is treated as the owner pursuant to Code Sections 671 through 677; provided, however, that the subsequent failure of such Person to be treated as the owner of such trust pursuant to such Code Sections shall be deemed a Transfer by such Person to such trust;

(e)     a trust, each Trust Beneficiary of which is the spouse or a Family Member of such Person; provided, however, that the subsequent failure of any Trust Beneficiary to be a Family Member of such Person shall be deemed a Transfer by such Person to such trust; and provided, further, that the subsequent Transfer by the trust to the spouse of such Person shall be deemed a Transfer by such Person to such spouse;

(f)     any entity in which all of the ownership interests are owned by such Person or by Family Members of such Person;

(g)     with respect to a Transfer by a trust, the Trust Beneficiaries in accordance with the terms of the trust instrument, provided that such Transfer is not also deemed a Transfer pursuant to Section 11.2(e) hereof; or with respect to a Transfer by any other entity, the equity owners thereof;

(h)      with respect to a Transfer by an incompetent individual, the guardian or legal representative of said incompetent individual; and with respect to a Transfer by such guardian or legal representative, any Person who would otherwise have been a Permitted Transferee of said incompetent individual; or

(i)      any Person to whom such interest is Transferred pursuant to the provisions of Section 12 hereof.

11.3      ***Conditions to Permitted Transfers***.  A Transfer shall not be treated as a Permitted Transfer under Section 11.2 hereof unless and until the following terms and conditions are satisfied or waived by the Managers:

(a)      Except in the case of a Transfer at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Managers such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement. In the case of a Transfer at death or involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Managers of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company.  In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)      Except in the case of a Transfer at death or involuntarily by operation of law, the transferor shall furnish to the Company an opinion of counsel, which counsel and opinion shall be satisfactory to the Company, that the Transfer will not result in the termination of the Company pursuant to Code Section 708 or the classification of the Company as a corporation for federal income tax purposes and that such Transfer will not cause the rules of Code Sections 168(g)(1)(B) and 168(h) (generally referred to as the "tax exempt entity leasing rules") or similar rules to be applicable to the Company, Company Property, or the Members.

(c)      The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number and sufficient information to determine the transferee's initial tax basis in the Transferable Interests Transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns.  Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any Transferred Transferable Interests until it has received such information.

(d)      Except in the case of a Transfer at death or involuntarily by operation of law, either (i) such Transferable Interests shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (ii) the transferor shall provide an opinion of counsel, which

opinion and counsel shall be satisfactory to the Company, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

(e)     Except in the case of a Transfer at death or involuntarily by operation of law, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company, to the effect that such Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940, or a "publicly traded partnership" within the meaning of Code Section 7704.

11.4    **_Prohibited Transfers_**.

(a)     Any purported Transfer of a Direct or Indirect Interest that is not a Permitted Transfer shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the transferee shall have only the rights and privileges of a Transferee and the rights of the Transferee to allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy the debts, obligations, or liabilities for damages that the transferor or transferee of such Direct or Indirect Interests may have to the Company.

(b)     In the case of a Transfer of Direct or Indirect Interests that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

11.5    **_Rights of Unadmitted Transferees_**.  If any person acquires any Transferable Interests, but is not admitted as a Substituted Member pursuant to Section 11.6 hereof, such Person shall have only the rights and privileges of a Transferee.

11.6    **_Substituted Member_**.  No Person taking or acquiring, by whatever means, including, but not limited to the foregoing provisions of this Section 11 and the provisions of Section 12 hereof, the Transferable Interest of any Member in the Company shall be admitted as a Substituted Member without the consent of a Majority in Interest of the Members and unless such Person:

(a)     Is given the right to so elect by the assignor Member, and elects to become a Substituted Member by delivering notice of such election to the Company;

(b)      Executes, acknowledges, and delivers to the Company a Joinder to this Agreement in the form set forth in Exhibit "B" attached hereto;

(c)      Pays a transfer fee to the Company in an amount sufficient to cover all reasonable expenses connected with the admission of such Person as a Substituted Member; and

(d)      If not an individual of legal majority, provides the Company with evidence satisfactory to counsel to the Company of the authority of such Person to become a Member and to accept, adopt, and agree to be bound by the terms and conditions of this Agreement.

Upon the completion of any Transfer of a Member's Transferable Interest permitted pursuant to this Section 11 or Section 12 hereof, such Member (the "Transferring Member") shall cease being a Member under and a party to this Agreement and shall not be included in the definition of a "Member" whenever such term may appear herein; provided, however, that any such Transferring Member shall continue to be entitled to all of the benefits and rights and shall be responsible for all of the duties and obligations of a Member hereunder, determined as of the date of such disposition.

11.7      ***Distributions and Allocations in Respect to Transferred Transferable Interests***. If any Transferable Interest is Transferred during any fiscal year of the Company in compliance with the provisions of this Section 11 or Section 12 hereof, Profits, Losses, each item thereof and all other items allocable to such Transferable Interest for such fiscal year shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during such fiscal year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Managers.  All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that if the Company does not receive a notice stating the date such Transferable Interest was transferred and such other information as the Managers may reasonably require within thirty (30) days after the end of the fiscal year of the Company during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the Transferable Interest on the last day of the fiscal year during which the Transfer occurs.  Neither the Company nor the Managers shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 11.7, whether or not the Managers or the Company have knowledge of any Transfer of ownership of any Transferable Interest.

## SECTION 12.  DISTRESSED AND DECEASED MEMBER

12.1     ***Option to Purchase Transferable Interest of a Distressed Member***.  If any Person owning a Direct or Indirect Interest:  (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to such Direct or Indirect Interest and such involuntary petition, assignment or attachment is not discharged within ninety (90) days after its effective date, or (iii) is subjected to any other possible involuntary Transfer of such Direct or Indirect Interest by legal process, including, without limitation, a Transfer pursuant to a divorce decree (any such affected Person referred to herein as a "Distressed Person," any Member in which the Distressed Person owns a Direct or Indirect Interest referred to herein as a "Distressed Member," and any such event referred to herein as a "**Triggering Event**"), the remaining Members, and if the remaining Members fail to act, the Company, shall have the right and option, which shall be non-assignable, to purchase or to redeem, respectively, all of the Distressed Member's Transferable Interest (the "Distressed Interest") for the Purchase Price determined pursuant to Section 12.3 hereof and upon the terms and conditions provided therein.

(a)     Upon the occurrence of a Triggering Event, each of the Members (excluding the Distressed Member) shall have the option, exercisable by written notice to the Distressed Member and to the Company within sixty (60) days after the Triggering Event (the "Initial Option Period"), to purchase the Distressed Interest in proportion to their respective Transferable Interests (or if any Member does not elect to purchase such Member's proportionate share of the Distressed Interest, each Member shall be entitled to purchase that portion of the balance of the Distressed Interest not purchased in proportion to the Transferable Interests of the Members that elect to purchase all or a portion of the Distressed Interest or in any other proportions that the Members agree to); provided, however, if the Members elect to purchase only a portion of the Distressed Interest, such election to purchase by the Members shall be effective and binding upon the Distressed Member only if the Company elects to purchase the remaining portion of the Distressed Interest pursuant to Section 12.1(b) hereof.

(b)     To the extent that the Members have not exercised their option to purchase all of the Distressed Interest, upon the expiration of the Initial Option Period the Company shall have the option, exercisable by written notice to the Distressed Member within thirty (30) days after the Initial Option Period expires, to redeem all (but not less than all) of the Distressed Interest that is not being purchased by the Members pursuant to Section 12.1(a) hereof.

If the Members and/or the Company do not purchase all of the Distressed Interest pursuant to Sections 12.1(a) and/or 12.1(b) hereof, then the Distressed Person's Direct or Indirect Interest may be transferred by operation of law, subject to the provisions and restrictions of this Agreement; provided, however, that no Transferee shall become a Substituted Member except in accordance with the provisions of this Agreement.

12.2     ***Transfer of Transferable Interest of a Deceased Member***.  Upon the death of any Person (referred to herein as the "Deceased Person," and any Member in which the Deceased Person owned

a Direct or Indirect Interest referred to herein as a "Deceased Member"), the Deceased Person may Transfer the Direct or Indirect Interest owned by the Deceased Person to a Permitted Transferee, provided that such Transfer complies with all terms of this Agreement.  If such Transfer is not to a Permitted Transferee, such event shall be a "Triggering Event" and the surviving Members, and if the surviving Members fail to act, the Company shall have the option, which shall not be assignable, to purchase or redeem, respectively, that portion of the Deceased Member's Transferable Interest not transferred to a Permitted Transferee (if the Transfer is that of a Transferable Interest or any interest therein) or all of the Deceased Member's Transferable Interest (if the Transfer is that of any other Direct or Indirect Interest), pursuant to the terms and conditions provided in Sections 12.1(a) and 12.1(b) hereof (substituting "Deceased Member" for "Distressed Member" therein), for the Purchase Price determined pursuant to Section 12.3 hereof and upon the terms and conditions provided therein.

12.3   ***Purchase Price and Terms***.

(a)   The Purchase Price for the Transferable Interest of a Distressed Member or Deceased Member (the "Selling Member") to be purchased pursuant to this Section 12 shall be an amount equal to the fair market value of such Transferable Interest, taking into account all appropriate valuation discounts and premiums ("Fair Market Value").  The Selling Member and the Acquiring Purchasers will each have the opportunity to appoint a Qualified Appraiser, as hereinafter defined, within thirty (30) days of the exercise of the Acquiring Purchasers' option to purchase the Selling Member's Transferable Interest. If either party fails to appoint a Qualified Appraiser within this thirty (30) day period, the other Qualified Appraiser shall unilaterally establish the Fair Market Value of the Selling Member's Transferable Interest by a written opinion within forty-five (45) days of appointment.  If both parties appoint Qualified Appraisers within the thirty (30) day period described above, these two (2) Qualified Appraisers shall establish the Fair Market Value of the Selling Member's Transferable Interest in a single written opinion agreed to by both of them.  If such two (2) Qualified Appraisers cannot agree on the Fair Market Value of the Selling Member's Transferable Interest within forty-five (45) days of the appointment of the latter of them, these two (2) Qualified Appraisers shall together appoint a third Qualified Appraiser whose sole written opinion shall establish the Fair Market Value of the Selling Member's Transferable Interest within forty-five (45) days of appointment.  The Selling Member and the Acquiring Purchasers shall each bear the expense of its own Qualified Appraiser and shall equally share the costs of the third Qualified Appraiser, if any.  A "Qualified Appraiser" is a professional appraiser who is a member of the American Society of Appraisers and designated Accredited Senior Appraiser (ASA), a member of the American Institute of Certified Public Accountants and designated Accredited in Business Valuation (ABV), a member of the National Association of Certified Valuation Analysts and designated Certified Valuation Analyst (CVA), or a member of the Institute of Business Appraisers and designated Certified Business Appraiser (CBA), or successor certification bodies, and who is qualified by experience and ability to appraise interests in limited liability companies.

(b)   The Purchase Price for any such sale of the Selling Member's Transferable Interest shall be paid pro rata by each Acquiring Purchaser in proportion to the share of the Transferable Interest being purchased by each Acquiring Purchaser and shall be evidenced by a promissory note executed and delivered by such Acquiring Purchaser to the Selling Member at the closing of the sale of the Transferable Interest and shall bear interest accrued on the unpaid balance thereof from date of closing at an annual rate equal to the minimum rate required to be stated in order to avoid the imputation of interest or

the creation of foregone interest, pursuant to the appropriate provisions of the Code, and shall be payable in thirty-six (36) equal monthly installments so that the unpaid balance of the Purchase Price shall be fully amortized over such thirty-six (36) month period (the "Promissory Note"). The payment of the first monthly installment shall be made on the first day of the calendar month immediately following the calendar month in which closing of the sale of the Transferable Interest occurs, and each subsequent installment shall be made on the first day of each succeeding calendar month until the unpaid balance of the Promissory Note and all accrued interest thereon has been paid in full. Upon default in the payment of any installment of principal or interest due under the Promissory Note, the unpaid balance of the Promissory Note and all interest accrued thereon shall become due and payable immediately. Each Acquiring Purchaser shall have the option of prepayment, in whole or in part, at any time, without penalty.

(c)     The closing of the purchase of the Transferable Interest of the Selling Member shall take place at the principal place of business of the Company within thirty (30) days after the later to occur of:  (i) the determination of the Purchase Price pursuant to this Section 12.3; or (ii) if applicable, the appointment of the personal representative of the Deceased Member's estate, or if no personal representative is required to be appointed, sixty (60) days after the Deceased Member's death. At the time of closing, the Selling Member or the Selling Member's legal representative, if applicable, shall execute and deliver to the Acquiring Purchasers such assignments, certificates of authority, tax releases, consents to transfer, instruments and evidences of title as may be reasonably required by the Acquiring Purchasers.

### 12.4   *Right of First Refusal*.

(a)     If any Member (the "Selling Party") receives a "Bona Fide Offer", as defined below, to purchase all or any portion of the Selling Party's Transferable Interest (the "Subject Transferable Interest") and the Selling Party wishes to accept such Bona Fide Offer, the Selling Party shall give written notice (the "Seller's Notice") to the Company and all Members other than the Selling Party (the "Remaining Members"), which notice shall contain the terms of the Bona Fide Offer, including the name(s) of the Person(s) who propose(s) to purchase the Subject Transferable Interest (the "Proposed Purchaser"), and shall also include a copy of the terms of such Bona Fide Offer. For purposes of this Agreement, the term "Bona Fide Offer" means an offer in writing from an independent unaffiliated party (who must be financially capable of carrying out the terms of the Bona Fide Offer), in a form legally enforceable against the Proposed Purchaser and irrevocable for a period of at least ninety (90) days from the date of the Seller's Notice, providing for a fixed purchase price (the "Offer Price") denominated and payable in United States dollars at closing or according to fixed terms, with or without interest.

(b)     The Company shall have the irrevocable first right to purchase all or any portion of the Subject Transferable Interest for the Offer Price and on the same terms and conditions as those set forth in the Bona Fide Offer (the "Company's Right of First Refusal"); provided, however, if the Company purchases only a portion of the Subject Transferable Interest, such election shall be binding upon the Selling Party only if the Remaining Members elect to purchase the remaining portion of the Subject Transferable Interest pursuant to Section 12.4(c) below. The Company's Right of First Refusal shall extend for a period of sixty (60) days from the date that the Seller's Notice is received (the "Exercise Period"). If the Company elects to purchase any of the Subject Transferable Interest, it shall send written notice of such

intention, setting forth the quantity of the Subject Transferable Interest to be purchased, to the Selling Party and the Remaining Members before the Exercise Period expires.

(c)     To the extent that the Company elects not to exercise the Company's Right of First Refusal with respect to all or any portion of the Subject Transferable Interest, the Remaining Members shall have the irrevocable right to purchase all (but not less than all) of the Subject Transferable Interest that is not being purchased by the Company pursuant to Section 12.4(b) above, in proportion to their respective Transferable Interests (or if any Remaining Member does not elect to purchase his proportionate share of the Subject Transferable Interest, in proportion to the Transferable Interests of the Remaining Members that elect to purchase all or a portion of the Subject Transferable Interest) for the Offer Price and on the same terms and conditions as those set forth in the Bona Fide Offer (the "Members' Right of First Refusal"), which shall extend for a period of thirty (30) days after the expiration of the Exercise Period (the "Extended Period"). The Members' Right of First Refusal shall extend for a period of thirty (30) days after the expiration of the Exercise Period (the "Extended Period"). If any Remaining Member elects to purchase any of the Subject Transferable Interest, it shall send written notice of such intention, setting forth the quantity of the Subject Transferable Interest to be purchased, to the Selling Party and the Company before the Extended Period expires.

(d)     If the Company and/or one or more of the Remaining Members elect to purchase the Subject Transferable Interest, a closing shall be held before the latest to occur of: (i) the expiration of the forty-five (45) day period following the receipt by the Selling Party of notice that the Company has elected to exercise the Company's Right of First Refusal, (ii) the expiration of the forty-five (45) day period following the receipt by the Selling Party of notice that one or more Remaining Members has elected to exercise the Members' Right of First Refusal, or (iii) the date of closing specified in the Bona Fide Offer. Such closing shall be pursuant to the terms and other provisions of the Bona Fide Offer (provided that the purchaser may substitute cash equal to the fair market value of any non-cash consideration provided for in the Bona Fide Offer).

(e)     If the Company and/or the Remaining Members do not purchase all of the Subject Transferable Interest pursuant to Sections 12.4(b) and/or 12.4(c) above, then the Selling Party may sell to the Proposed Purchaser, for the Offer Price and on the same terms and conditions specified in the Bona Fide Offer, all (but not less than all) of the Subject Transferable Interest; provided, however, that the Proposed Purchaser shall take and hold all rights and interest in such Subject Transferable Interest subject to the provisions of this Agreement and the Proposed Purchaser shall not become a Substituted Member except in accordance with the provisions of this Agreement. If, however, such sale is not consummated within the lesser of (i) one hundred eighty (180) days after the date that the Seller's Notice is received or (ii) the period of time specified in the Bona Fide Offer, then the Company's Right of First Refusal and the Members' Right of First Refusal as set forth this Section 12.4 shall again be effective.

(f)     The Selling Party shall, upon written request by the Company, vote or cause a vote to be made (as a Member of the Company) in favor of the exercise by the Company of the Company's Right of First Refusal.

## SECTION 13.  DISSOLUTION AND WINDING UP

13.1     ***Dissolution***.  The Company shall dissolve upon the first to occur of any of the following events:

(a)      The election of all the Members to dissolve the Company;

(b)      Upon the occurrence of any event of dissolution under the Act.

13.2     ***Deadlock Sale Provision***.  In the event of a deadlock sale provision, the Manager(s) shall rely upon Florida Statute 605.0702.

13.3     ***Winding Up***.   Upon a dissolution of the Company, the Managers, or court-appointed trustee if there be no Manager, shall take full account of the Company's liabilities and Company Property and the Company Property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order:

(a)      To the payment and discharge of all of the Company's debts and liabilities to creditors, including Members who are creditors; including the establishment of any necessary reserves;

(b)      To the Members and Transferees in accordance with Section 5.3 hereof.

13.4     ***Filing of Articles of Dissolution and Statement of Termination***.

(a)      If the Members elect to dissolve the Company, Articles of Dissolution shall be promptly filed with the Florida Department of State.

(b)      Upon completion of the winding up of the Company, the Managers or court-appointed trustee may file a Statement of Termination with the Florida Department of State.

13.5     ***Compliance with Timing Requirements of Regulations***.   If the Company is "liquidated" within the meaning of Section 1.704-1(b)(2)(ii)($g$) of the Regulations, distributions shall be made pursuant to this Section 13 (if such liquidation constitutes a dissolution of the Company) or Section

5.2 hereof (if it does not) to the Members who have positive Capital Accounts in compliance with Section 1.704-1(b)(2) of the Regulations. Distributions pursuant to the preceding sentence may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company Property, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Managers arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Manager, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

      13.6   ***Rights of Members***.   Except as otherwise provided in this Agreement, each Member shall look solely to the Company Property for the return of such Member's Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company. No Member shall have priority over any other Member as to the return of such Member's Capital Contributions, distributions or allocations.

## SECTION 14.  POWER OF ATTORNEY

      14.1   ***Managers as Agents***.   Each Member hereby makes, constitutes and appoints the Managers as true and lawful agents for such Member and in such Member's name, place and stead and for such Member's use and benefit, to sign, execute, certify, acknowledge, swear to, file and record:

      (a)   this Agreement and all agreements, certificates, instruments and other documents amending or changing this Agreement as now or hereafter amended which the Managers may deem necessary, desirable or appropriate including, without limitation, amendments or changes to reflect: (i) the exercise by the Managers of any power granted to the Managers under this Agreement; (ii) any amendments adopted by the Members in accordance with the terms of this Agreement; (iii) the admission of any substituted Member; and (iv) the disposition by any Member of the Transferable Interest of such Member; and

      (b)   any certificates, instruments and documents as may be required by, or may be appropriate under, the laws of the State of Florida or any other state or jurisdiction in which the Company is doing or intends to do business. Each Member authorizes each such agent to take any further action which such agent shall consider necessary or advisable in connection with any of the foregoing, hereby giving such agent full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratifying and confirming all that any such agent shall lawfully do or cause to be done by virtue thereof or hereof.

      14.2   ***Nature as Special Power***.   The power of attorney granted pursuant to this Section 14:

(a)      is a special power of attorney coupled with an interest and is irrevocable;

(b)      may be exercised by any such agent by listing the Members executing any agreement, certificate, instrument or other document with the single signature of any such agent acting as agent for such Members; and

(c)      shall survive the death, disability, legal incapacity, bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of such Person's interest in the Company, except that where the assignment is of such Member's entire interest in the Company and the Transferee, with the consent of the Managers, is admitted as a Substituted Member, the power of attorney shall survive any such agent to effect such substitution.

## SECTION 15.  MISCELLANEOUS

15.1    **_Notices_**.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be delivered personally to the Person or to an officer of the Person to whom the same is directed, or sent by regular, or certified mail, addressed as follows:  (i) if to the Company, to the Company at the address set forth in Section 1.5 hereof, or to such other address as the Company may from time to time specify by notice to the Members; (ii) if to a Manager, to such Manager at the Company's address; or (iii) if to a Member, to such Member at the address set forth on Exhibit "A" attached hereto, or to such other address as such Member may from time to time specify by notice to the Company.  Any such notice shall be deemed to be delivered, given and received for all purposes as of the date so delivered, if delivered personally or if sent by regular mail, or as of the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, if sent by certified mail, postage and charges prepaid.

15.2    **_Binding Effect_**.  Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

15.3     *Remedies*.

(a)     Any claim or controversy arising out of or relating to this Agreement or a breach hereof shall, upon the request of any party involved, be submitted to and settled by arbitration pursuant to Chapter 682 of the Florida Statutes and in accordance with the rules then obtaining in the State of Florida of the American Arbitration Association (or any other form of arbitration mutually acceptable to the parties so involved).  The decision made pursuant to such arbitration shall be binding and conclusive on all parties involved; and a judgment upon such decision may be entered in the highest court of any state or federal forum, having jurisdiction.

(b)     Each Member acknowledges and agrees that the remedy at law for the breach of any of the terms of this Agreement would be inadequate, and agrees and consents that temporary and permanent injunctive and other equitable relief including specific performance, may be granted in any proceeding which may be brought to enforce any provision hereof, without the necessity of proof of actual damage or inadequacy of legal remedy.

(c)     In addition to specific performance, any Member shall be entitled to any other remedy allowable under the laws of the State of Florida.

(d)     In the event of any litigation between the parties, the prevailing party shall be entitled to the payment of reasonable attorney's fees, including appellate attorney fees, and all court costs relating hereto.

15.4     *Construction*.  The Members acknowledge and agree that each Member has reviewed this Agreement and that every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member and that any rule of construction resolving ambiguities against the drafting Member shall not be employed in the interpretation of this Agreement or any amendment thereto.

15.5     *Time*.  Time is of the essence with respect to this Agreement.

15.6     *Headings*.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

15.7     *Severability*.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

15.8     ***Incorporation by Reference***.  Every exhibit, schedule and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

15.9     ***Additional Documents***.  Each Member agrees, upon the request of the Managers, to perform all further acts and execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

15.10     ***Variation of Pronouns***.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural, as the identity of the Person or Persons may require.

15.11     ***Choice of Law***.  The validity, interpretation and enforcement of this Agreement and all other instruments and documents executed in connection with this transaction, and the interpretation of the rights and duties of the Members, shall be governed by the laws of the State of Florida, excluding those laws relating to the resolution of conflicts between laws of different jurisdictions.  The parties agree that the proper venue for any action brought hereunder shall be in Palm Beach County, Florida.

15.12     ***Waiver of Action for Partition***.  Each Member irrevocably waives any right that the Member may have to maintain any action for partition with respect to any of the Company Property.

15.13     ***Counterpart Execution***.  This Agreement may be executed in any number of counterparts with the same effect as if all of the signatories had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

15.14     ***Entire Agreement***.   This Agreement expresses the entire and exclusive understanding of the parties hereto with respect to the matters covered hereby and incorporates any and all prior agreements, understandings, negotiations and discussions relating hereto, whether written or oral, all of which are hereby terminated and canceled.

15.15     ***Waiver***.  No waiver of any breach or condition of this Agreement shall be deemed to a waiver of any other subsequent breach or condition, whether of like or different nature.  No course of dealing shall be effective to change, modify or discharge any provision of this Agreement or to constitute a waiver of any default.

**IN WITNESS WHEREOF**, the Company and the Members have entered into this Operating Agreement effective as of the Filing Date.  Execution of this Operating Agreement by a Manager constitutes such Manager's joinder hereto.

**COMPANY:**

**TRC FUNDING GROUP NO. 1 LLC**

By: _____

    Ghen Sugimoto, Manager

By:_____

    David E. Hammer, Manager

**WITNESSES:**

Print Name:_____

Print Name:_____

**MEMBERS:  COMMON UNITS**

Smart Legal Solutions LLC

_____

By:

Its:  Manager

_____

By:

Its:  Manager

**MEMBERS:  PREFERRED UNITS**

(includes Series A, A-IRO, B, and C)

Print Name:_____    _____

Print Name:_____    _____

Print Name:_____    _____

Print Name:_____    _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____        _____

Print Name:_____     _____

Print Name:_____     _____

Print Name:_____     _____

Print Name:_____     _____

Print Name:_____     _____

# <u>ACKNOWLEDGMENTS</u>

STATE OF FLORIDA

COUNTY OF

      The foregoing instrument was acknowledged before me this _____ day of _____, \_\_\_\_\_, by **_____,** as a Member of **THE COMPANY,** a Florida limited liability company. **_____** is personally known to me or has produced as identification.

_____

NOTARY PUBLIC

Print Name:_____

State of Florida, at Large

My Commission Expires:

STATE OF FLORIDA

COUNTY OF

      The foregoing instrument was acknowledged before me this _____ day of _____, _____, by _____, as a Member of **THE COMPANY,** a Florida limited liability company. _____ is personally known to me or has produced as identification.

_____

NOTARY PUBLIC

Print Name:_____

State of Florida, at Large

My Commission Expires:

STATE OF FLORIDA

COUNTY OF

      The foregoing instrument was acknowledged before me this _____ day of _____, _____, by _____, as a Member of **THE COMPANY,** a Florida limited liability company. _____ is personally known to me or has produced as identification.

_____

NOTARY PUBLIC

Print Name:_____

State of Florida, at Large

My Commission Expires:

STATE OF FLORIDA

COUNTY OF

       The foregoing instrument was acknowledged before me this _____ day of _____, \_\_\_\_\_, by _____, as a Member of **THE COMPANY,** a Florida limited liability company. _____ is personally known to me or has produced as identification.

_____

NOTARY PUBLIC

Print Name:_____

State of Florida, at Large

My Commission Expires:

STATE OF FLORIDA

COUNTY OF

      The foregoing instrument was acknowledged before me this _____ day of _____, _____, by _____, as a Member of **THE COMPANY,** a Florida limited liability company. _____ is personally known to me or has produced as identification.

 

 

_____

NOTARY PUBLIC

Print Name:_____

State of Florida, at Large

My Commission Expires:

STATE OF FLORIDA

COUNTY OF

     The foregoing instrument was acknowledged before me this _____ day of _____, \_\_\_\_\_, by _____**,** as a Member of **THE COMPANY,** a Florida limited liability company. _____ is personally known to me or has produced as identification.

 

              _____

              NOTARY PUBLIC

              Print Name:_____

              State of Florida, at Large

My Commission Expires:

# EXHIBIT "A"

## TO

## OPERATING AGREEMENT

## OF

## THE COMPANY

## A FLORIDA LIMITED LIABILITY COMPANY

| Member<br>Names and Addresses | Initial<br>Capital Contribution | Transferable Interest |
|---|---|---|
| Hammer Capital Group LLC | $625 | 625 Common Units |
| Taisho Investments, LLC | $375 | 375 Common Units |
| TOTAL | $1000 | 1000 Common Units |

# EXHIBIT "B"

## TO

## OPERATING AGREEMENT

### OF

## THE COMPANY

## A FLORIDA LIMITED LIABILITY COMPANY

# JOINDER OF MEMBER

Pursuant to the requirements of the operating agreement (the "Operating Agreement") of THE COMPANY (the "Company") dated as of _____, I hereby acknowledge the assignment of a Transferable Interest in the Company, and agree to become admitted as a "Member" as such term is used in the Operating Agreement, to be bound by and subject to all of the terms, provisions, restrictions and obligations contained in the Operating Agreement as if I were an original party thereto, and that my interest in the Company is, and continues to be, subject to the Operating Agreement and particularly the restrictions on transfers contained therein. I hereby acknowledge that I have received and read a copy of the Operating Agreement.

IN WITNESS WHEREOF, I have executed this Joinder on the _____ day of _____, 20___.

_____

# EXHIBIT "C"

## TO

## OPERATING AGREEMENT

## OF

## THE COMPANY

## A FLORIDA LIMITED LIABILITY COMPANY

# JOINDER OF MANAGER

Pursuant to the requirements of the operating agreement (the "Operating Agreement") of THE COMPANY (the "Company") dated as of _____, I hereby acknowledge that I have been elected manager of the Company, and agree to serve as manager, to be bound by and subject to all of the terms, provisions, restrictions and obligations contained in the Operating Agreement as if I were an original party thereto.  I hereby acknowledge that I have received and read a copy of the Operating Agreement.

IN WITNESS WHEREOF, I have executed this Joinder on the _____ day of _____, 20___.

_____

# EXHIBIT 2

**Guaranty**

January 27, 2017

Ladies and Gentlemen:

Reference is made to the Private Placement Memorandum and the Exhibits, dated January 26, 2017 ("Memorandum"), issued by TRC Funding Group No. 1 LLC ("TRC") to prospective investors, and which is attached hereto as Exhibit "A".

Effective from the date hereof, the undersigned, Lonny Bramzon, on behalf of Bramzon & Associates Specialty Litigation LLC ("BASL"), as its sole manager and stakeholder, hereby asserts that BASL elects to be a "Guarantor" of the faithful performance of the financial commitments and obligations by TRC Funding Group No. 1 LLC to each investor who subscribes and purchases Preferred Series A Units, Preferred Series A-IRO Units, Preferred Series B Units and/or Preferred Series C Units ("Investor") pursuant to the terms set forth in the Memorandum and corresponding accepted Subscription Agreements with each Investor.

BASL confirms that it currently has a docket of approximately 12,500 transvaginal cases and 2,500 other cases, including but not limited to Xarelto, Pradaxa, Risperdahl, IVC blood clot filter, Talc Powder, Invokana and Benicar, thousands of which are currently in various stages of the settlement process for its clients.

Without limiting the generality of the foregoing, BASL hereby agrees to perform all the obligations of a Guarantor to TRC's financial obligations to each Investor, to the same extent and with the same force and effect as if the undersigned were the issuer of the Memorandum and accepted each Investor's Subscription Agreement.

The undersigned acknowledges that this Guaranty shall be effective upon its execution and delivery by the undersigned to TRC. Further, it shall not be necessary for Guarantor to execute this Agreement for each Investor that receives a copy of this Guaranty. This Agreement shall be construed in accordance with and governed by the laws of the State of Florida.

Very truly yours,

Lonny Bramzon, Manager on behalf of
Bramzon & Associates Specialty Litigation LLC
2101 L Street NW, Suite 800
Washington, DC 20037

District of Columbia: SS
Subscribed and Sworn to before me
this    1    day of FEBRUARY , 2017

Kirston Lloyd, Notary Public, D.C.
My commission expires October 31, 2021

1

**Guaranty**

April 17, 2017

Ladies and Gentlemen:

Reference is made to the Private Placement Memorandum and the Exhibits, dated January 31, 2017 ("Memorandum"), issued by TRC Funding Group No. 1 LLC ("TRC") to prospective investors, and which is attached hereto as Exhibit "A".

The undersigned, Lonny Bramzon, on behalf of Bramzon & Associates Specialty Litigation LLC ("BASL"), as its sole manager and stakeholder, hereby asserts that BASL elects to be a "Guarantor" of the faithful performance of the financial commitments and obligations by TRC Funding Group No. 1 LLC to each investor who subscribes and purchases Preferred Series A Units, Preferred Series A-IRO Units, Preferred Series B Units and/or Preferred Series C Units ("Investor") pursuant to the terms set forth in the Memorandum and corresponding accepted Subscription Agreements with each Investor.

BASL confirms that it currently has a docket of approximately 12,500 transvaginal cases and 2,500 other cases, including but not limited to Xarelto, Pradaxa, Risperdahl, IVC blood clot filter, Talc Powder, Invokana and Benicar, thousands of which are currently in various stages of the settlement process for its clients.

Without limiting the generality of the foregoing, BASL hereby agrees to perform all the obligations of a Guarantor to TRC's financial obligations to each Investor, to the same extent and with the same force and effect as if the undersigned were the issuer of the Memorandum and accepted each Investor's Subscription Agreement.

The undersigned acknowledges that this Guaranty shall be effective upon its execution and delivery by the undersigned to TRC.  Further, it shall not be necessary for Guarantor to execute this Agreement for each Investor that receives a copy of this Guaranty.  This Agreement shall be construed in accordance with and governed by the laws of the State of Florida.

Very truly yours,

Lonny Bramzon, Manager on behalf of
Bramzon & Associates Specialty Litigation LLC
2101 L Street NW, Suite 800
Washington, DC 20037

4/14/17

Notary Public State of Florida
Heidi Laub
My Commission FF 206737
Expires 03/05/2019

Personally Known.
Brought Only

# EXHIBIT 3

**Guaranty**

Dr. Kevin Friedman
1640 Canopy Chase Drive
Atlanta, GA   30319
April 17, 2017

Dear Kevin:

 Reference is made to the Private Placement Memorandum and the Exhibits, dated January 31, 2017 ("Memorandum"), issued by TRC Funding Group No. 1 LLC ("TRC") to prospective investors, and which is attached hereto as Exhibit "A".

 Effective from the date hereof, the undersigned, Mitchell Hammer ("Hammer"), individually, hereby asserts that he elects to be a "Guarantor" of the faithful performance of the financial commitments and obligations by TRC Funding Group No. 1 LLC to you, Kevin Friedman who subscribed and purchased a total of eighty-five (85) Preferred Series A-IRO Units, of which twenty-five (25) Units were purchased on January 13, 2017 and sixty (60) Units were purchased today, pursuant to the terms set forth in the Memorandum and corresponding accepted Subscription Agreements with each Investor.

 Without limiting the generality of the foregoing, Hammer hereby agrees to perform all the obligations of a Guarantor to TRC's financial obligations to you, to the same extent and with the same force and effect as if the undersigned were the issuer of the Memorandum and accepted each Investor's Subscription Agreement.

 The undersigned acknowledges that this Guaranty shall be effective upon its execution and delivery by the undersigned to TRC.  This Agreement shall be construed in accordance with and governed by the laws of the State of Florida.

Very truly yours,

*Mitchell Hammer*

Mitchell Hammer, individually

4/14/17
Personally Known

Notary Public State of Florida
Heidi Laub
My Commission FF 206737
Expires 03/05/2019

# EXHIBIT 4

## GUARANTY

This Personal Guaranty ("Guaranty") is made this 24th day of August 2017, by the undersigned in order to induce Michael Schoeff (hereinafter "Investor") to enter into that certain Private Placement Memorandum ("PPM"), dated January 31, 2017 with TRC Funding Group No. 1 LLC, a Florida limited liability company (hereinafter referred to as the "Company") located at 1000 Corporate Drive, Suite 610, Fort Lauderdale, Florida 33334.

The undersigned guarantors (hereinafter collectively referred to as "Guarantor") jointly and severally, absolutely and unconditionally guarantee to Investor and assume full responsibility for financial performance by the Company under the PPM and Investor's Subscription Agreement to redeem the Preferred Units, purchased by Investor for four hundred thousand dollars ($400,000.00) on the date above ("Purchase").

This Guaranty is of a continuing nature and may not be canceled by the undersigned for so long as the Investor's Preferred Units purchased on this date have not been fully redeemed pursuant to the terms of the Subscription Agreement, as accepted by the Company.  This Guaranty shall be construed and interpreted in accordance with the laws of the State of Florida. Investor shall not be obligated or required to exhaust its remedies against the Company as a condition precedent to its enforcement of or collection under this Guaranty.  This instrument of Guaranty shall be construed as a guaranty of payment and performance rather than as a guaranty of collection.

The undersigned, as Guarantor, waives all common law and statutory defenses, if any, and all notices of default, demand, extension, renewal, acquiescence or waivers on the part of the Company and no act or manner of conduct of the Landlord shall act, be construed or operate to release the obligations of the undersigned as Guarantor.  Guarantor hereby consents, without notice to Guarantor and without affecting their liability to the Investor, and apply any sums in whatever manner paid or realized to pay liabilities of the Company to the Investor regardless of what liabilities of the Company remain unpaid or unperformed.

The undersigned acknowledges, as principal of the Company, that Investor's purchase of Preferred Units is of substantial and material benefit to the Guarantor; that but for Guarantor's agreement to guaranty the Company's obligations and duties set forth above, Investor would not have purchased the referenced Preferred Units on this date; that they have received valuable consideration for the execution and delivery of this Guaranty to Investor, and that this Guaranty shall inure to the benefit of Investor, its successors and assigns.  As further inducement to Investor to purchase the Preferred Units and in consideration hereof, the undersigned Guarantor agrees that in any action or proceeding brought on, under or by virtue of this Guaranty, the undersigned shall and does hereby knowingly, voluntarily, and intentionally waive trial by jury in respect to any litigation based hereon or arising out, under or in connection with this Guaranty, and the undersigned agrees that the applicable courts of Florida will have jurisdiction over the undersigned and that venue for any such litigation or proceeding shall lie in Broward County, Florida.  If any action, litigation or proceeding are instituted by Investor to enforce the terms of this Guaranty or its rights hereunder against Guarantor, then Guarantor agrees to pay Investor all expenses incurred by Investor relative or arising out of such action, litigation or proceeding,

including, but not limited to, court costs and all attorneys' fees incurred by Investor through all trial and appellate levels.

Guarantor has read, understand, and agree to the provisions contained in this Guaranty, have had an opportunity to have this Guaranty reviewed by their independent counsel, and hereby voluntarily execute this Guaranty with the intent to be legally bound by its terms, conditions, and obligations set forth herein.

*Notwithstanding anything to the contrary contained herein, this Guaranty shall be limited to any violation of the covenants set forth below, which has not been cured within thirty (30) business days from the date of a violation, and shall be deemed a Recourse Event (as defined below).* In the event of a Recourse Event, there shall be no limitation on this Guaranty.

A "Recourse Event" shall mean:

a) With the exception of additional purchases of Preferred Units, from the date hereof, (i) by Investor of Preferred Units for $500,000, (ii) by Kevin Friedman for $25,000 no later than August 21, 2017, (iii) Vijay Patel for $500,000 no later than October 31, 2017, and (iv) an additional amount that would bring the total capital raised under the PPM to five million dollars ($5,000,000.00), providing that the additional amount would be redeemable after Investor's Purchase is redeemed, the Company shall be required to notify Investor within thirty (30) business days to advise that the Company and/or its affiliates raised additional capital, only if the repayment of the subsequently raised capital would have a payment preference or priority of any kind whether, structured as a redeemable preferred, debt instrument or any other form. In the event that Company is required to provide Investor with the aforementioned notice, the Company shall offer the Investor one of the three following options, the selection of which supersedes and replaces the terms set forth in the PPM:

   (i)   Investor gives its prior written approval waiving this Recourse Event and advising the Company and its affiliates that the Investor has no objection to the Company and/or its affiliates proceeding with the capital raise and that Investor wishes to continue with its Purchase of Preferred Units consistent with the Subscription Agreement that Investor provided and the Company accepted;

       or

   (ii)   Investor advises the Company to fully redeem Investor's forty (40) Preferred Units, which were purchased on August 24, 2017 for four hundred thousand U.S. dollars (US$400,000) ("Purchase Price"), no later than thirty (30) days from the date of Investor's written notice ("Accelerated Redemption Date"), by paying Investor the sum of:

       a.  Purchase Price in the Purchase; plus
       b.  An amount equal to 8.33% per month multiplied by the Purchase Price times the number of months calculated from the date of the Investor's



Subscription Agreement through the Accelerated Redemption Date; or

(iii)   Investor advises the Company to fully redeem Investor's forty (40) Preferred Units, which were purchased on <u>August 24, 2017</u> for <u>four hundred thousand U.S. dollars (US$400,000) ("Purchase Price"),</u> no later than thirty (30) days from the date of Investor's written notice ("Accelerated Redemption Date"), by paying Investor the sum of:

    a. Either:

        i.  8.33% per month multiplied by the Purchase Price for each month from the date of the Subscription through the Accelerated Redemption Date commencing from the date of the purchase through the date of redemption if the Accelerated Redemption Date is less than one hundred eighty (180) days; or

        ii.  8.33% multiplied by twelve (12) if the Accelerated Redemption Date is one hundred eighty (180) days or more from the date of the original purchase of the Preferred Units; <u>plus,</u>

    b. Rolling over the Partial Redemption Amount (as that term is defined in the PPM), which is Ten thousand U.S. dollars (US$10,000) per Preferred Unit acquired by the Investor in the Purchase, into either Preferred Series B Units or Preferred Series C Units as provided in the PPM.

b) Any increase in the amount of compensation in excess of two hundred fifty thousand dollars ($250,000) plus (i) a five percent (5%) cost of living increase every 12 months and (ii) a performance bonus of up to fifty percent (50%), for any twelve month period commencing from the date hereof, to each of Ghen Sugimoto, Diane Sugimoto, David Hammer or Mitchell Hammer.

**GUARANTOR: GHEN SUGIMOTO**

By: _____

Address: ██████████████ _____

███████████ _____

Social Security Number: ███████ ____

Dated this __24th__ day of August __, 2017.

**GUARANTOR:  DAVID HAMMER**

By: _David Hammer_____

Address: ██████████████ _____

███████████ _____

Social Security Number: ███████ ____

Dated this __24th__ day of August __, 2017.

**GUARANTOR:  MITCHELL HAMMER**

By: _Mitchell Hammer_____

Address: ██████████████ _____

███████████ _____

Social Security Number: ███████ ____

Dated this __24th__ day of August __, 2017.



# EXHIBIT 5

## GUARANTY

This Personal Guaranty ("Guaranty") is made this 24th day of August 2017, by the undersigned in order to induce George Skaff (hereinafter "Investor") to enter into that certain Private Placement Memorandum ("PPM"), dated January 31, 2017 with TRC Funding Group No. 1 LLC, a Florida limited liability company (hereinafter referred to as the "Company") located at 1000 Corporate Drive, Suite 610, Fort Lauderdale, Florida 33334.

The undersigned guarantors (hereinafter collectively referred to as "Guarantor") jointly and severally, absolutely and unconditionally guarantee to Investor and assume full responsibility for financial performance by the Company under the PPM and Investor's Subscription Agreement to redeem the Preferred Units, purchased by Investor for one hundred thousand dollars ($100,000.00) on the date above ("Purchase").

This Guaranty is of a continuing nature and may not be canceled by the undersigned for so long as the Investor's Preferred Units purchased on this date have not been fully redeemed pursuant to the terms of the Subscription Agreement, as accepted by the Company.  This Guaranty shall be construed and interpreted in accordance with the laws of the State of Florida. Investor shall not be obligated or required to exhaust its remedies against the Company as a condition precedent to its enforcement of or collection under this Guaranty.  This instrument of Guaranty shall be construed as a guaranty of payment and performance rather than as a guaranty of collection.

The undersigned, as Guarantor, waives all common law and statutory defenses, if any, and all notices of default, demand, extension, renewal, acquiescence or waivers on the part of the Company and no act or manner of conduct of the Landlord shall act, be construed or operate to release the obligations of the undersigned as Guarantor.  Guarantor hereby consents, without notice to Guarantor and without affecting their liability to the Investor, and apply any sums in whatever manner paid or realized to pay liabilities of the Company to the Investor regardless of what liabilities of the Company remain unpaid or unperformed.

The undersigned acknowledges, as principal of the Company, that Investor's purchase of Preferred Units is of substantial and material benefit to the Guarantor; that but for Guarantor's agreement to guaranty the Company's obligations and duties set forth above, Investor would not have purchased the referenced Preferred Units on this date; that they have received valuable consideration for the execution and delivery of this Guaranty to Investor, and that this Guaranty shall inure to the benefit of Investor, its successors and assigns.  As further inducement to Investor to purchase the Preferred Units and in consideration hereof, the undersigned Guarantor agrees that in any action or proceeding brought on, under or by virtue of this Guaranty, the undersigned shall and does hereby knowingly, voluntarily, and intentionally waive trial by jury in respect to any litigation based hereon or arising out, under or in connection with this Guaranty, and the undersigned agrees that the applicable courts of Florida will have jurisdiction over the undersigned and that venue for any such litigation or proceeding shall lie in Broward County, Florida.  If any action, litigation or proceeding are instituted by Investor to enforce the terms of this Guaranty or its rights hereunder against Guarantor, then Guarantor agrees to pay Investor all expenses incurred by Investor relative or arising out of such action, litigation or proceeding,

including, but not limited to, court costs and all attorneys' fees incurred by Investor through all trial and appellate levels.

Guarantor has read, understand, and agree to the provisions contained in this Guaranty, have had an opportunity to have this Guaranty reviewed by their independent counsel, and hereby voluntarily execute this Guaranty with the intent to be legally bound by its terms, conditions, and obligations set forth herein.

_Notwithstanding anything to the contrary contained herein, this Guaranty shall be limited to any violation of the covenants set forth below, which has not been cured within thirty (30) business days from the date of a violation, and shall be deemed a Recourse Event (as defined below)._ In the event of a Recourse Event, there shall be no limitation on this Guaranty.

A "Recourse Event" shall mean:

a) With the exception of additional purchases of Preferred Units, from the date hereof, (i) by Investor of Preferred Units for $500,000, (ii) by Kevin Friedman for $25,000 no later than August 21, 2017, (iii) Vijay Patel for $500,000 no later than October 31, 2017, and (iv) an additional amount that would bring the total capital raised under the PPM to five million dollars ($5,000,000.00), providing that the additional amount would be redeemable after Investor's Purchase is redeemed, the Company shall be required to notify Investor within thirty (30) business days to advise that the Company and/or its affiliates raised additional capital, only if the repayment of the subsequently raised capital would have a payment preference or priority of any kind whether, structured as a redeemable preferred, debt instrument or any other form.  In the event that Company is required to provide Investor with the aforementioned notice, the Company shall offer the Investor one of the three following options, the selection of which supersedes and replaces the terms set forth in the PPM:

    (i) Investor gives its prior written approval waiving this Recourse Event and advising the Company and its affiliates that the Investor has no objection to the Company and/or its affiliates proceeding with the capital raise and that Investor wishes to continue with its Purchase of Preferred Units consistent with the Subscription Agreement that Investor provided and the Company accepted;

    or

    (ii) Investor advises the Company to fully redeem Investor's ten (10) Preferred Units, which were purchased on August 24, 2017 for one hundred thousand U.S. dollars (US$100,000) ("Purchase Price"), no later than thirty (30) days from the date of Investor's written notice ("Accelerated Redemption Date"), by paying Investor the sum of:

        a. Purchase Price in the Purchase; plus
        b. An amount equal to 8.33% per month multiplied by the Purchase Price times the number of months calculated from the date of the Investor's

Subscription Agreement through the Accelerated Redemption Date;

or

(iii)   Investor advises the Company to fully redeem Investor's ten (10) Preferred Units, which were purchased on <u>August 24, 2017</u> for <u>one hundred thousand U.S. dollars (US$100,000) ("Purchase Price")</u>, no later than thirty (30) days from the date of Investor's written notice ("Accelerated Redemption Date"), by paying Investor the sum of:

    a.  Either:

        i.  8.33% per month multiplied by the Purchase Price for each month from the date of the Subscription through the Accelerated Redemption Date commencing from the date of the purchase through the date of redemption if the Accelerated Redemption Date is less than one hundred eighty (180) days; or

        ii.  8.33% multiplied by twelve (12) if the Accelerated Redemption Date is one hundred eighty (180) days or more from the date of the original purchase of the Preferred Units; <u>plus</u>,

    b.  Rolling over the Partial Redemption Amount (as that term is defined in the PPM), which is Ten thousand U.S. dollars (US$10,000) per Preferred Unit acquired by the Investor in the Purchase, into either Preferred Series B Units or Preferred Series C Units as provided in the PPM.

b)  Any increase in the amount of compensation in excess of two hundred fifty thousand dollars ($250,000) plus (i) a five percent (5%) cost of living increase every 12 months and (ii) a performance bonus of up to fifty percent (50%), for any twelve month period commencing from the date hereof, to each of Ghen Sugimoto, Diane Sugimoto, David Hammer or Mitchell Hammer.

**GUARANTOR: GHEN SUGIMOTO**

By: _____

Address: __100 Jefferson Ave., #10017__

____Miami Beach, FL 33139_____

Social Security Number: __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__

Dated this __24th__ day of August __, 2017.

**GUARANTOR:  DAVID HAMMER**

By: _David Hammer_____

Address: __382 NE 191st St. #44113___

_Miami, FL 33179_____

Social Security Number: __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__

Dated this _24th___ day of August __, 2017.

**GUARANTOR:  MITCHELL HAMMER**

By: _Mitchell Hammer_____

Address: __333 Las Olas Way, #1909___

__Fort Lauderdale, FL 33301_____

Social Security Number: __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__

Dated this __24th___ day of August __, 2017.

Notary Public State of Florida
Heidi Laub
My Commission FF 206737
Expires 09/06/2019